Jerry Lane JUREK, Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellee.

No. 78–1374.

United States Court of Appeals, Fifth Circuit.

Aug. 11, 1980.

Jay H. Topkis, John Charles Boger, New York City, for petitioner-appellant.

Mark L. White, Atty. Gen., Anita Ashton, R. Kristin Weaver, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJO-

FLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, JR., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.*

GARZA, Circuit Judge:

We have gathered en banc to consider the circumstances surrounding the arrest, interrogation, confession, and trial of Jerry Lane Jurek, convicted of murder and sentenced to death in a Texas state district court. A panel of this Court has reversed a federal district court's denial of Jurek's petition for a writ of habeas corpus. *Jurek v. Estelle*, 593 F.2d 672 (5th Cir. 1979). The panel majority based its decision upon conclusions that Jurek's two confessions were involuntary, and that the exclusion of certain veniremen at his trial contravened the rule of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A new trial was held to be required.

On reconsideration en banc, we have concluded that Jurek's first confession was voluntarily given, and that it may constitutionally be admitted in a new trial. We have also concluded that the second confession was involuntarily given, and may not be used.[1] Grounding our decision on those bases, we need not and do not reach the *Witherspoon* issue.

## THE STANDARD OF REVIEW

We are met at the outset with questions relating to the standard of review. In considering a district court's denial of habeas corpus relief sought on the ground of an admitted confession's involuntariness, must we accept the findings of the district court unless clearly erroneous? If there were no specific findings on crucial issues, what is our role? These questions arise from a collision of authorities.

On one hand, the Supreme Court has frequently stated that it is our affirmative duty "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976). *See also Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *Haynes v. Washington*, 373 U.S. 503, 515–16, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963); *Spano v. New York*, 360 U.S. 315, 316, 79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 (1959); *Ashcraft v. Tennessee*, 322 U.S. 143, 147–48, 64 S.Ct. 921, 923, 88 L.Ed. 1192 (1944); *Lisenba v. California*, 314 U.S. 219, 237, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). This duty is not "foreclosed by the finding of a court, or the verdict of a jury, or both." *Lisenba*, 314 U.S. at 237–38, 62 S.Ct. at 290.

On the other hand, we are confronted by the well-established rule that factual questions in habeas corpus proceedings should be determined by the district court and that its factual conclusions are binding on the court of appeals unless clearly erroneous. *Patterson v. United States*, 487 F.2d 341 (5 Cir. 1973); Fed.R.Civ.P. 52. *Accord: United States ex rel. Henne v. Fike*, 563 F.2d 809, 813 (7 Cir. 1977); *Bellew v. Gunn*, 532 F.2d 1288, 1291 (9 Cir. 1976); *Leasure v. Lockhart*, 509 F.2d 23, 25 (8 Cir. 1975);

---

* Judge Goldberg, was a member of the en banc court under 28 U.S.C. § 46(c) and participated in the oral argument of the case en banc. Since that time he has taken senior status and therefore does not participate in the consideration or decision of this case. Judge Jerre S. Williams did not participate in the oral argument and the conference on this case and, therefore, does not participate in this decision.

1. A majority of the judges on this en banc court have determined that the first confession was voluntary; a majority have determined that the second confession was involuntary, mandating the reversal of the district court, the granting of habeas corpus, and the inadmissibility of the second confession in any subsequent retrial of Jurek. This opinion speaks for the majority of the court on each issue. Judges BROWN and REAVLEY have filed separate opinions, joined by those listed therein, in which they dissent in part on the ground that the second confession should also be held voluntary and admissible; they would accordingly affirm the district court. Judges GODBOLD and FRANK M. JOHNSON, JR. have also filed separate opinions, joined by those listed, in which they dissent in part on the ground that the first confession should be involuntary and inadmissible.

*United States ex rel. Marino v. Rundle,* 464 F.2d 149 (3 Cir. 1972); *Zovluck v. United States,* 448 F.2d 339, 341 (2 Cir. 1971); *Monnich v. Kropp,* 408 F.2d 356, 357 (6 Cir. 1969); *Linebarger v. Oklahoma,* 404 F.2d 1092, 1094 (10 Cir. 1968); *Vanater v. Boles,* 377 F.2d 898, 900 (4 Cir. 1967).

■ The panel majority, citing the opinion of the Supreme Court in *Beckwith, supra,* concluded that "we may overturn the district court's conclusion on [the ultimate issue of voluntariness] even if it is not clearly erroneous." 593 F.2d 672 at 677. Plainly, that is not the law with regard to findings *of fact.* We will not disregard or overturn specific findings of fact made by the district court unless they are clearly erroneous. Pursuant to our duty to examine the *"entire"* record and make an independent appraisal of the voluntariness issue, however, we may, where the district court made no findings on matters crucial to the ultimate determination, reach into the record and rely on undisputed facts clearly supported therein. If such clarity does not appear, a remand for further findings may be in order. We note as a caveat that where some or all of the evidence was not the live testimony of witnesses, but instead consisted of transcripts, depositions, or documents reviewed by the lower court, the clearly erroneous rule will not apply with full force where "the appellate court is in as good a position as the lower court to evaluate the testimony that is crucial to the case." *Caradelis v. Refineria Panama, S.A.,* 384 F.2d 589, 593 (5 Cir. 1967). Thus, we may draw our own inferences from such evidence. *See Nash v. Estelle,* 597 F.2d 513, 518 (5 Cir. 1979) (en banc). In passing on the ultimate issue of voluntariness, we may substitute our own judgment even in the absence of a conclusion that the district court's ruling was clearly erroneous. No less is required by the admonition of the Supreme Court to make an *"independent"* review.

The facts and procedural history of this case have been oft-recited, yet we must relate them in some detail once more, for the chronology is crucial. Counsel for Jurek have argued that there are no disputed fact issues, and that on the undisputed facts Jurek's confessions were involuntary as a matter of law. It must be noted, however, that in several important areas the findings of fact made by the district court were not comprehensive. The following recital will, where necessary, reach beyond those findings to incorporate undisputed facts which are clearly supported in the record, or portions of the state record and depositions from which we are able to draw our own inferences.

## THE FACTS

The victim, ten year old Wendy Adams of Cuero, Texas, disappeared on August 16, 1973. Jurek was awakened at his parent's home at approximately one o'clock on the morning of August 17th by two police officers acting on a report that she had been seen screaming for help in Jurek's truck as it sped through Cuero. One of the officers was her father, Ronnie Adams. Jurek was questioned briefly, and was read *Miranda* warnings by Adams. He was taken barefoot and without a shirt to the Cuero jail, where he was logged in and placed under arrest at 2:30 a. m. The authorities discovered an outstanding arrest warrant on a "hot check" charge, by which they could hold him.

Jurek was questioned again that morning at about 9:00. At some point, he volunteered to take a polygraph examination. He was taken in the afternoon to Austin, the state capitol approximately 120 miles from Cuero. Upon being tested, he was confronted with results suggesting that he had lied. As his counsel stated on oral argument, "he turned to science for help, and science turned him down." Jurek then gave an oral confession of responsibility for Wendy Adams' death, stating that her body had been thrown into the Guadalupe River. While he apparently gave several conflicting versions of the crime, his statement led to the discovery of the girl's body on the next morning. It was the first time that

the investigating authorities had learned she was dead.[2]

Jurek was returned to Cuero and taken immediately before a magistrate, Justice of the Peace Albert B. Ley. Judge Ley read him the list of rights printed on a "Magistrate's Certificate" form.[3] Ley testified as to what occurred at this interview in the state district court, both at a suppression hearing on the confessions, and at trial. Since the federal district court had before it nothing more than the same transcript of that testimony that we now review, "our interpretation of the interview is unconstrained by the usual strictures of the clearly erroneous standard." *Nash v. Estelle*, 597 F.2d at 518.

At the suppression hearing, Ley testified that Jurek had stated that he understood the rights read to him. In response to a question concerning his knowledge of the Jurek family's financial standing, directed toward ascertaining the reason for the high bond he had set, Ley responded:

A Well, other than just hearsay of the financial standing of them. I couldn't be positive about the standing of them, other than he did tell me when we talked about it, that—that he could not afford a lawyer and the Court would have to appoint him one. And I said, well, that's what it states in here, that if you are unable and if you sign a pauper's oath, why, then they would set—we would appoint an attorney to represent you.

At trial on the merits, Ley was again questioned as to the appointment of counsel, and the following colloquy occurred:

Q All right. When you came to that part of the warning which says that he has the right to have an attorney—

A That's right.

Q —appointed, did you go into that with any detail?

A I went into it with him and asked him if he wanted an attorney with him before I finished reading it. And before I started reading it, I asked him, and he said he didn't just to go ahead and read it.

The federal district court found that Ley quoted Jurek as stating, "he could not afford a lawyer and the court would have to appoint one for him." It disregarded the later testimony we have quoted, which is important to a full understanding of the "need for counsel" statement made by Jurek.

The principals involved in the interrogation of Jurek following his appearance before Judge Ley were De Witt County Attorney Robert Post, and District Attorney Wiley Cheatham, who later prosecuted the case at trial. Post testified at Jurek's trial as to the events surrounding the confessions, and Cheatham was deposed before the instant habeas corpus proceeding. As with the Ley testimony in the state court we may examine the entirety of their testimony, the district court below having considered only the bare transcripts.

After Jurek signed the Magistrate's Certificate, he and Cheatham made one trip to a place where Jurek said the body might be found. It was not discovered. Cheatham testified by deposition at the federal habeas

2. We have no record of precisely what Jurek said at the examination. His counsel does not dispute that an oral confession was made.

3. Those warnings follow:
 1.) He was entitled to the services of a lawyer of his own choice to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the State.
 2.) If he could not afford to hire a lawyer, he could ask for and receive the services of a lawyer appointed to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the State, without any cost or charge to him.
 3.) He had the right to remain silent, not to answer any questions or make any statements at all, nor incriminate himself in any manner.
 4.) Anything he said could and would be used against him in a court or courts of law for the offense or offenses of which he might be accused.
 5.) He could refuse to answer any questions at any time, and he could stop answering questions at any time.

corpus proceeding that as arrangements were being made to transfer Jurek to Victoria, Texas, for the night, the accused asked to speak with him, and the process of obtaining a written confession began.[4] Post and Cheatham were present when Jurek gave the first written confession. Cheatham typed it himself, as it was given.[5] At 1:15 a. m., Jurek signed the confession. Two persons witnessed his signature, and one of them testified that he was warned of his rights again, and that the statement was voluntary. The district court noted County Attorney Post's testimony at the state suppression hearing that Jurek had stated before signing that he did not want an attorney.

The first confession is composed of simple, ungrammatical prose. Jurek stated that he had asked Wendy Adams at the Cuero swimming pool to go riding in his truck, and that he had driven "out to Hell's Gate Bridge" with the girl in the back of the truck. Jurek recounted that at the bridge she had criticized his drinking, and Jurek's brother's neglect of his family. He stated that he had become enraged, and began choking her. When she was still, he threw her into the river. There was nothing to support a theory that Jurek had kidnapped the girl, or had attempted sexual relations with her.

The lack of such aggravating factors is crucial to an understanding of the events which followed. As the panel opinion noted, 593 F.2d at 675 n.4, under the relevant Texas Penal Code provision in effect at the time of this crime, the crime of murder could be "punishable by death only if an aggravating factor was present. See Tex. Penal Code Art. 1257(b)." (For current version, see Tex.Penal Code Ann. Art. 1903.) Jurek was charged with having committed murder in the course of kidnapping and attempted rape. The first confession did not bear these accusations out, and examination of Wendy Adams' body yielded no suggestion of attempted rape or of any sexual contact.

Following his signing of the confession, Jurek was transferred to the jail at Victoria, approximately fifty miles away, for what we are told were security reasons. At about 10:00 a. m. the victim's body was found floating in the Guadalupe River. That afternoon Jurek was returned to Cuero for further interrogation. No court-appointed attorney was waiting. Cheatham testified as to his motivation for further questioning:

Q I understand. What was the purposes of taking the second statement?

A Well, we found out there were parts of the first statement that we felt were incorrect, not true.

Q There's no question that this young man was reluctant as far as you recall, were concerned, to tell you the truth about what happened?

---

4. Under the provision of the Texas Code of Criminal Procedure governing the admissibility of confessions in effect at that time, it was obviously preferable for the prosecution to attempt the introduction of a written confession as opposed to an oral one. An oral confession was relevantly admissible under Tex.Code. Crim.Proc. Art. 38.22(1) if under subsection (a) it was "shown to be the voluntary statement of [an] accused taken in the presence of an examining court in accordance with law," or, under subsection (e), it included "a statement of facts [and] circumstances that are found to be true, which conduce to establish [the guilt of the accused], such as the finding of secreted or stolen property, or the instrument with which . . . the offense was committed." This version of article 38.22 was effective between August, 1967 and August, 1977.

5. District Attorney Cheatham testified with regard to the first confession:

Q Now, when you typed the statement, did you use his exact words? How did you—how did you arrive at that?

A As nearly as possible.

Q Did you omit anything that he said?

A The problem in typing on of these statements is—ask if its in his words as near as I can type it. It was—you understand when they give these statements, they don't just start at the first and smoothly go all the way. They'll go along and back up and tell you something and we've probably let him—and again, I'm talking about, about generals, about letting him breathe, well, talk all the way through and then back and say, we'll say okay. Let's start and get it down or something like that.

A Well, you're going to have to be— your statement is so broad I can't answer without giving you—or you could take several different views of what my answer was. If you'll be more specific.

Q Well, the first written statement he didn't—in your opinion, was—upon what you had heard and read about the case, he didn't tell you the whole truth about it?

A I questioned the truth, but I had to put it down like he gave it to me. I would have questioned it. In fact, I don't think—I think Mr. Middaugh has confirmed my suspicions about how bad it was, but I don't think he ever told us all of what I felt that he could have said. But again, I have to put it down, what he says, not what I think or feel like had happened.

Q Yes, but as far as the taking of the first statement that was in writing, was concerned, he was reluctant to tell you the whole truth in your opinion based upon what you knew about the case?

A Well, the way you're putting it, you're making it—I can't answer yes or no, I have to qualify—

Q He just didn't tell you, in your opinion, all the truth on this first statement?

A Well, I felt like there was sexual involvement all along, but he didn't say that so I couldn't put it in there. I wouldn't have put it in.

This testimony echoed that of Post at Jurek's trial:

A We just felt that he knew more than what he was telling us, as to the reasons, and what-not.

Q Was this just a feeling on your part?

A Yes, sir.

On Jurek's return to Cuero, he was brought to Post's office. There, interrogation by Post, Cheatham, and several others began. Cheatham testified that:

". . . neither he [Post] nor I did much questioning. I more or less related

to him that I felt a part of his statement was not correct, that I felt that there was sex or things like that involved and he was pretty brief and he said, well, I'm going to stand on my first statement and I said well, if that's the way you feel and I had a hard long day and I got up and went out to the hall."

Post recounted at the state trial that after Cheatham left, Jurek indicated that he wanted to talk. Cheatham returned, and Jurek was taken to his office. The second confession was written in longhand by Post, and typed by Cheatham's secretary. Post testified that he put Jurek's own words down, "as near as possible as I could . . ."

The correct grammar and composition of this confession are, however, vastly different from those of the first. It would be impossible to conclude that the same person gave each confession verbatim. The panel majority quoted a sentence in the second confession: "in the statement that I gave him I did not tell the truth about the conversation I had with Wendy at the river and the prior discussion about trying to find some girls to pick up and I now herein wish to correct that statement." It did not, however, note the facial distinction between the two statements. The district court did not mention the composition of either.

In the second confession Jurek stated that he had strangled the child after she refused to have sexual relations with him. Post was questioned as to whether Jurek was informed of the import of this statement:

Q . . . But did you really explain to the defendant what the effect of this statement was? Did you at any time tell the defendant that if he signed this second statement he was sending himself to the electric chair?

A No, sir. I don't think I did.

Not having been informed of its significance, Jurek signed what was in effect his death warrant. At the time he did so he had been in custody forty-two hours and had seen neither his parents, nor a lawyer.

### TRIAL, APPEALS, AND HABEAS CORPUS

Counsel for Jurek was appointed by Judge Ley after the second confession had been signed. The appointment was confirmed by State District Judge Kelly. The attorneys, George Middaugh and Emmett Summers III, moved to suppress the written confessions. Their motion was denied, and both confessions were admitted. Jurek was convicted of murder, and was sentenced to death in the punishment phase of his trial, under the bifurcated Texas system.

The Texas Court of Criminal Appeals affirmed, rejecting an argument that the confessions were involuntary. *Jurek v. State*, 522 S.W.2d 934, 942–43 (Tex.Cr.App.1975). The Supreme Court granted certiorari, 423 U.S. 238, but only on the issue of the validity of the Texas death penalty statute. It affirmed, holding the state law constitutional. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The action of the Court of Criminal Appeals in upholding the admission of the confessions had been complained of in Jurek's petition for certiorari.

After the Supreme Court denied rehearing, the state district court formally sentenced Jurek, and set his execution for January 19, 1977. Petitions for habeas corpus were denied by the state trial court and the Court of Criminal Appeals on January 10th and 11th. On January 12th petitioner filed an application for a stay of execution in the Supreme Court, and on January 13th he filed a stay application and an application for a writ of habeas corpus in the United States District Court for the Southern District of Texas. On January 17th, the Supreme Court granted a stay pending the filing of a petition for certiorari. It denied certiorari on March 28th, stating:

> "Without intimating any views on the merits of the questions presented to the United States District Court for the Southern District of Texas in petitioner's pending application for a writ of habeas corpus, [the] petition for [a] writ of certiorari [is] denied . . .." 430 U.S. 951, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977).

The federal district court then granted a stay of execution on March 30th and began consideration of the habeas corpus application.

The application was based on numerous grounds, the voluntariness of Jurek's confessions and the *Witherspoon* issue among them. The district court held an evidentiary hearing at which three doctors and one of Jurek's trial attorneys testified.

The doctors' testimony went to one important facet of this case, the issue of Jurek's mental capacity. The district court found that "testimony at the evidentiary hearing, as well as expert testimony during the trial of Jurek, established that petitioner is an individual of below-average intelligence, mildly retarded, with possible organic brain damage." In another part of the opinion, it stated that "[J]urek's intelligence is below average, or 'dull normal.'" While the medical testimony was in some conflict, and the quoted conclusions may somewhat overstate the extent of Jurek's mental limitations, we cannot say that these holdings were clearly erroneous.

The district court, on the basis of its evidentiary hearing and briefs submitted by the parties, denied the habeas corpus application in an unpublished memorandum opinion. A panel of this court, cited *supra*, concluded that under the totality of the circumstances both confessions were involuntary, and that error in the state court under the *Witherspoon* doctrine also mandated a new trial. Chief Judge Coleman dissented, arguing that both confessions were voluntary, and that the *Witherspoon* issue should not be reached. A petition for rehearing en banc was granted by a majority of the judges then on this court. *Jurek v. Estelle*, 597 F.2d 590 (5 Cir. 1979).

### CONSTITUTIONAL STANDARDS

The panel majority opinion provides an exhaustive survey of the case law relating to the voluntariness of confessions. *See* 593 F.2d 676–79. We do not dispute the validity of the principles stated therein, but differ only on their application to the facts of this case.

■ The panel majority noted that there is no "talismanic" test yielding a formula for a mechanical determination of voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). It recited a number of expressions by the Supreme Court of the fundamental requirements for voluntariness.[6] Those statements may be synthesized to require that in order to find Jurek's confession voluntary, we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him. The burden of proving facts which would lead to an opposite conclusion is on the habeas corpus applicant. *Bruce v. Estelle*, 536 F.2d 1051 (5 Cir. 1976).

This is, necessarily, a case-by-case endeavor. We must weigh the totality of the circumstances and examine their impact on Jerry Lane Jurek as to each of his confessions, guided by those cases which have identified factors, "red flags" which will arouse the suspicion and close scrutiny of the reviewing court. *See Fikes v. Alabama*, 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957). We must determine whether the sum of the circumstances compels a finding of involuntariness.

It has been repeatedly argued that the confessions are simply the truth, and the state has frequently invoked the brutality of the crime. We are bound by our oaths to bar such considerations from our decision of this case. "We are not called upon in this proceeding to pass on the guilt or innocence of the petitioner of the atrocious crime that was committed." *Davis v. North Carolina*, 384 U.S. 737, 739, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895 (1966). The issue of voluntariness must be addressed "with complete dis-

regard of whether or not petitioner in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).

The panel relied on a number of factors in reaching its conclusion of involuntariness. It noted Jurek's limited verbal intelligence, and the problem of "suggestibility" flowing therefrom. Secondly, it relied upon a conclusion that Jurek's confessions were apparently not in his own words. Third, it took into account the "manifest attitude" of the prosecutors toward Jurek, as reflected by their actions. Emphasis was placed upon Jurek's partial lack of clothing when taken into custody, the movements from Cuero to Austin to Cuero and to Victoria and back, and that the accused saw neither counsel nor family for forty-two hours, covering the period in which the confessions were given. The majority fourthly identified the failure to appoint an attorney immediately following Jurek's "request" before the magistrate. Finally, it was noted that the prosecuting authorities did not "relent" following Jurek's first confession, evincing a "purposeful interrogation" directed not toward solving the crime, but to securing a statement on which they could convict [or enhance the punishment of] Jurek. On reconsideration en banc, it is instructive to begin by examining each of these factors.

## JUREK'S MENTAL LIMITATION

■ In considering the voluntariness of a confession, this court must take into account a defendant's mental limitations, to determine whether through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of his own free will. The

---

6. The panel opinion recites, 593 F.2d 672 at 676:

To be voluntary a confession must be "the product of an essentially free and unconstrained choice." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). The decision to confess must be "freely self-determined," *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961), "the product of a

rational intellect and a free will," *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). The defendant's "will to resist," *Rogers v. Richmond*, 365 U.S. at 544, 81 S.Ct. at 741, must not be overborne; nor can his "capacity for self-determination [be] critically impaired," *Culombe v. Connecticut*, 367 U.S. at 602, 81 S.Ct. at 1879.

938

Supreme Court has made clear that such an inquiry involves "a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953). The concern in a case involving a defendant of subnormal intelligence is one of suggestibility. *See Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). Doubtless, if the prosecutors pursue a specific object in the interrogation of such an accused, and the resulting confession bears the precise fruit of their aims, it will be doubly suspect.

In this case, the district court did not find, and the record would not support a finding that Jurek was so mentally deficient that his confessions must necessarily be held involuntary, or that he could not understand the circumstances surrounding his interrogation and confession. Questions of suggestibility and possible overreaching are raised, however, and must be factored into a consideration of the totality of the circumstances.

### THE COMPOSITION OF THE CONFESSIONS

We have noted that there is an obvious facial distinction between the two confessions. The first statement could plausibly be attributed to Jurek's own words. We must view incredulously, however, any suggestion that the second confession came directly from the accused. It is noteworthy that the second was taken in longhand by a prosecutor and then typed.

■ The panel majority was doubtless correct in its statement that prosecution-composed confessions are highly suspect, particularly where the accused is of below normal intelligence, citing *Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265 (1959); *Blackburn v. Alabama*, 361 U.S. 199, 204, 207–08, 80 S.Ct. 274, 278, 280, 4 L.Ed.2d 242 (1960); *Fikes v. Alabama*, 352 U.S. 191, 195, 77 S.Ct. 281,

283, 1 L.Ed.2d 246 (1957). As to the first confession, we have undisputed testimony that it was taken word for word as closely as possible, and a document that, from the four corners, does not contradict the testimony. With the second confession, however, we have the same testimony, but a document which could not have been attributed to the author of the first, is far too sophisticated in its grammar to be consistent with the medical testimony concerning Jurek's intelligence, and contains, as the panel majority noted, "even a touch of legalese." We will, accordingly, look on the second confession with that suspicion mandated by the Supreme Court.

### JUREK'S "REQUEST" FOR COUNSEL

The panel majority placed great emphasis on Jurek's statement before the magistrate that he could not afford a lawyer and that the court would have to appoint one for him. Noting that the district court had held that Jurek's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), were not violated by the failure to appoint counsel immediately, the panel majority cited *United States v. Priest*, 409 F.2d 491 at 493 (5 Cir. 1969), for the proposition that "any subsequent 'waiver' of counsel—such as the statement Jurek made to the county attorney before his first confession—has no legal significance." 593 F.2d at 679. However, it expressly declined to "decide whether the magistrate's inexplicable failure to appoint counsel, and the subsequent continued interrogation, formally violated *Miranda* ;" rather, it considered the matter "to be further evidence of the involuntariness of his confessions." *Id.*

The district court concluded that "Jurek told the magistrate that he could not afford counsel . . . It is not clear that Jurek *asked* for counsel at that time," and found that "[T]he record in this case shows conclusively that Jurek was asked if he wanted counsel, but Jurek clearly declined the right to counsel."

■ We agree that the question should be considered as evidence of involuntari-

ness. We believe, however, that the district court's findings were correct, and that they both negate any conclusion that *Miranda* was violated, and demonstrate the minimal effect of the lack of immediate assistance on the voluntariness issue.

*Priest*, relied on by the panel majority, announced a *per se* rule holding any waiver of counsel ineffective after a request for assistance was made. The rule of *Priest* was limited by this court, sitting en banc, in *Nash v. Estelle*, 597 F.2d 513 (1979). There, the court construed *Priest* to bar any inquiry as to waiver where a request for counsel is *unequivocal*, and when the request is *disregarded* and questioning proceeds. 597 F.2d at 517. It was further held that where a suspect has been informed of his rights and expresses both a desire for counsel and a wish to continue the interview without immediate assistance, it is proper for the authorities to make further inquiry to clarify his wishes. *Id. Priest* involved an unequivocal request for counsel, and therefore this case is far closer to *Nash*. In a recent decision involving a factual situation similar to the one before us, the opinion of this court *per* Judge Roney contains an exhaustive analysis of these cases and reaches the same conclusion we make here. *Blasingame v. Estelle*, 604 F.2d 893 (5 Cir. 1979).

▆ Whenever a question of waiver of counsel arises, a federal court must look to the totality of the circumstances surrounding the alleged waiver to determine whether, in truth and in fact, a knowing waiver occurred. Under this analysis we cannot consider Jurek's statement to Judge Ley in naked isolation. Rather, it must be read in conjunction with his later remarks that he did not desire counsel upon being asked if one should be secured *then*. This clarification was permissible under *Nash*, for the import of Jurek's first statement was that he could not afford a lawyer and would eventually need one. It was not an unequivocal request.

Therefore, we are not faced with a situation where a request for counsel was denied or ignored. Rather, the authorities did not independently, and against Jurek's clearly expressed desire to proceed without counsel, appoint a lawyer immediately. This, and no more, must be considered along with the other events in passing judgment on the voluntariness of these confessions.

### PROSECUTORIAL MOTIVATION

We must be alert, as the panel majority stated, to the "manifest attitude" of the police toward the defendant. *Culombe v. Connecticut*, 367 U.S. at 602, 81 S.Ct. at 1879; *Smith v. Heard*, 315 F.2d 692, 694 (5 Cir. 1963). The Supreme Court has mandated "the most careful scrutiny" where the primary aim of prosecutors was "securing a statement from defendant on which they could convict [the defendant]" as opposed to solving the crime. *Spano v. New York*, 360 U.S. at 323–24, 79 S.Ct. at 1207. We must also bear in mind the principle that a "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume they have properly discharged their official duties." *Nash v. Estelle*, 597 F.2d at 518, quoting *United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926).

Before Jurek's lie detector test, the primary concern of the authorities appears to have been the safe recovery of the little girl. After Jurek's oral confession, it seems to have shifted logically toward determining the exact circumstances of her death, Jurek's role in it, and to finding the remains. There is nothing in the record to suggest a drive toward Jurek's confession. After having been warned, he had already done so. He was taken before a magistrate promptly on returning from the polygraph examination, and soon after gave the first written confession. The district attorney testified that the written confession was taken after Jurek *sent for him*. In a very real sense, the first written confession stands in place of the earlier oral one. That first oral expression of guilt was rapidly supplanted by the written version, and the fact that counsel was not appointed at the intervening magistrate's hearing has little impact, as discussed *supra*.

As to the second confession, however, there is ample evidence of a prosecutorial "drive for the death penalty." The dimly articulated dissatisfaction of Cheatham and Post with the first confession, and their "feeling" that sex was involved, led them to bring Jurek back to Cuero for further interrogation. They already had a valid confession from Jurek, and the little girl's body showed no sign of sexual contact. They suggested to Jurek that they thought the first confession was incomplete and that sex had been involved, and did not explain the deadly effect of his signature on the second confession.

The panel majority mentioned these efforts in considering the motivation of the prosecutors, and its comments were limited to events surrounding the second confession:

> "When they questioned Jurek in an effort to elicit his second confession, the authorities were not trying to find Wendy Adams, for they had already found her body; they were not even trying to find out who killed her, for Jurek had already confessed to that. It is difficult to resist the conclusion that they were trying to gain the evidence that would send Jurek to his death." 593 F.2d at 679.

## OTHER FACTORS

Of those other actions by prosecuting authorities cited by the panel majority to support its conclusion, no single event is sufficient to place the stamp of involuntariness upon Jurek's confessions. His lack of clothing at his first interrogation must be considered in terms of the totality of the circumstances. The transfer of Jurek to Austin occurred at his own request, and the move to Victoria was apparently motivated by security reasons. That he saw neither his family nor an attorney through the execution of the second confession is indeed significant. However, as the first confession was given only twenty-four hours after his arrest and less than ten hours after his oral confession in Austin, the issue of isolation bears more on the second confession, made over forty hours after his arrest.

Having examined each of the factors which have been held by the panel to taint Jurek's confessions, we proceed to a consideration of their total effect on each confession.

## THE FIRST WRITTEN CONFESSION

 There is little to indicate that this document was involuntarily given. It was given after Jurek was given repeated warnings of his rights. It was given after he was accorded a lie detector test at his own request, at which he gave an oral confession. He had been before a magistrate, who again read him his rights, and explained them. While Jurek stated that he could not afford counsel, he also stated that he did not need one at that time. Examining the full range of circumstances under the totality approach, it is obvious that Jurek knowingly waived counsel before the first confession, particularly where he had been warned of his rights, and was doing no more than giving a written version of an oral confession made when no charges had been filed against him. Further, it cannot be held that the authorities, who had just secured an oral confession, who had warned Jurek of his rights and were met with firm statements that the accused did not want counsel at that time, should have ignored the waiver and appointed an attorney anyway. The confession appears to be in Jurek's words. There is little to indicate that the prosecutors were striving for any result other than the solution of the crime and the recovery of Wendy Adams' remains. It cannot be held that the totality of the circumstances reveal that this confession was not given of Jerry Lane Jurek's free will.

## THE SECOND CONFESSION

The circumstances are vastly different with regard to the second confession. We have mentioned that the authorities hauled Jurek back to Cuero for renewed interrogation which produced exactly the confession they desired. This document contradicted the first confession and could not conceivably have been composed by Jurek. There is no indication that he was informed of the

importance of the second confession. When Jurek's limited intelligence is factored into our consideration, it becomes evident that he could not have understood the gravity of his act in the absence of legal counsel. No court-appointed attorney worth his salt would have allowed Jurek to sign the second confession.

■ Other factors intervene to bolster an inescapable conclusion that the confession was involuntary. When the first was given, he had been in custody less than twenty-four hours, little of which had been spent in actual interrogation. He had confessed orally only that afternoon. By the time the second was signed, he had been out of contact with the outside world for over forty hours. The disapproval of those in control of his environment had been expressed to him, and they had suggested the direction in which they wished him to travel. We give relevance to the failure of the authorities to inform Jurek that the statement they sought embodied a factor which entailed the sentence of death only in that awareness of that fact would almost certainly have prevented a man in Jurek's situation from wearily accepting a suggested untruth, feeling that he had already sealed his fate via the first confession to murder. Considering that Jurek had been in custody and isolated for almost two days, that a valid confession solving the crime had been obtained, that the investigation had taken on, in a suggestive manner, the purpose of amending that confession to secure the death penalty, and that a defendant such as Jurek was surely incapable of

considering the effect of the amendment without help, the authorities should have ignored the waiver of immediate assistance and acted on Jurek's latent expression of "need" for counsel before the magistrate, or, at the very least, informed him of the significance of the information sought. Professional prudence and respect for Jurek's constitutional rights demanded no less.

## CONCLUSION

■ In holding one confession to be valid and another invalid under the constitution, we are in accord with the purpose and theory of appellate review of voluntariness issues. We sit to review the sum of the facts, and to determine if, and at what point, the totality of those facts renders a confession so suspect that to admit it into evidence would deny the defendant due process of law, and contravene the prohibition against compelled self-incrimination found in the Fifth Amendment.

That point will shift from case to case, dependent upon the presence or absence of factors suggesting coercion, intimidation, overreaching, or the deprivation of rights secured by the constitution, which combine to defeat the free and independent exercise of the will of an accused. As the panel majority noted, " . . . at some point the pressure can become too insistent; we can then say that the responses elicited are involuntary." 593 F.2d at 676. Here, there are almost no indicators pointing to an involuntary first confession. In the case of the second, the factors suggesting involuntariness predominate.[7]

---

7. It must be stressed that our holding breaks very little new ground, if any, in terms of the law concerning voluntariness; under the totality test, we have considered factors which have been established as relevant to this inquiry. The absence of one or more of them might have compelled a contrary result. The precise holding of this opinion, based on an analysis of the cumulative impact of these factors, is no more or less than the following: Where a (1) mentally deficient accused, who was (2) functionally isolated from all but his interrogators, (3) who was not assisted by counsel, (4) and who had executed a valid confession to murder, essentially solving the crime under investigation, was (5) the subject of continuing purposeful and suggestive interrogation directed (6) toward an amendment of his earlier confession to include information so minimally suggested as to amount to a prosecutorial "hunch," the renewed interrogation producing (7) a confession which is facially suspect and which (8) achieves the precise result sought by the prosecutors, (9) enhancing, in a manner unknown to the accused, the potential penalty to that of death, a consideration which would cause any person made aware of it to pause and carefully consider the truthfulness of any additional information suggested, the risk of involuntariness is so great that the confession cannot be admitted in consistency with due process guarantees and the privilege against self-incrimination.

Mr. Justice Frankfurter once observed that the problem of voluntariness involves considerations both of "liberty" and "security." *Culombe v. Connecticut,* 367 U.S. at 578, 81 S.Ct. at 1865. We are mindful of Justice Frankfurter's admonition that the conviction is "basic to our legal order, that men are not to be exploited for the information necessary to condemn them before the law, [and] that, in Hawkin's words, a prisoner is not to be made the deluded instrument of his own conviction." *Id.* at 581, 81 S.Ct. at 1867. We are also mindful of the necessities and difficulties of effective law enforcement, in which the confession may be an essential and fair device for the protection of the public. We have found that in their efforts to secure such protection by ensuring that Jurek was condemned, the law enforcement authorities ran far too high a risk of making him the deluded instrument of his own execution.

Therefore, the judgment of the District Court is REVERSED, and the cause is REMANDED with directions to grant the writ of habeas corpus, Jurek being entitled to a new trial without the use of his second confession.[8]

GODBOLD, Circuit Judge, with whom ALVIN B. RUBIN, Circuit Judge, joins, specially concurring:

With respect to the two written confessions, I join in the result reached in the special concurring opinion by Judge Frank M. Johnson, Jr., that both written confessions were inadmissible. With respect to the oral statements made by Jurek prior to the first written confession, I am not able to join in Judge Johnson's conclusion that all four were inadmissible.

I also agree with the conclusion set out in Judge Garza's opinion that the second written confession is inadmissible.

FRANK M. JOHNSON, Jr., Circuit Judge, with whom KRAVITCH, HATCHETT, R. LANIER ANDERSON, III, RANDALL, TATE and THOMAS A. CLARK, Circuit Judges, join, specially concurring:

I concur in the court's judgment that Jerry Lane Jurek is entitled to a new trial, and, more specifically, I agree with that portion of Judge Garza's opinion invalidating the second of the two confessions that were admitted against Jurek at trial. I cannot, however, agree with that portion of Judge Garza's opinion finding valid the first confession. In my opinion, the confessions were each constitutionally defective, one, because they were involuntary and thus their admission denied Jurek due process of law, *see Mincey v. Arizona,* 437 U.S. 385, 401–02, 98 S.Ct. 2408, 2418–19, 57 L.Ed.2d 290 (1978); two, because they were obtained in violation of Jurek's Sixth Amendment right to counsel, *see Brewer v. Williams,* 430 U.S. 387, 397–406, 97 S.Ct. 1232, 1238–43, 51 L.Ed.2d 424 (1977); and, three, because they were obtained in violation of Jurek's Fifth Amendment right not to be compelled to incriminate himself, *see Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).[1]

---

8. As was stated *supra,* we declined to pass on an assertion that violations of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) occurred during voir dire at Jurek's trial. We note that the Supreme Court has recently passed upon the applicability of *Witherspoon* to Texas voir dire procedures, in *Adams v. Texas,* —— U.S. ——, 100 S.Ct. 2521, 64 L.Ed.2d —— (1980). We are confident that upon any retrial of Jurek the state courts of Texas will act in full compliance with the teachings of *Adams.*

1. Like Judge Garza and Judge Brown, I express no view on the merits of Jurek's additional claims that the district court erred (1) in determining that his trial counsel had not been ineffective, (2) in failing to decide whether the prosecution's cross-examination of his father during his sentencing proceeding concerning otherwise undisclosed sex offenses with which Jurek had been charged but not indicted had violated his right to due process, (3) in refusing to permit him to present evidence on all of the factual contentions raised in his habeas petition, e.g., his contention that the imposition of death sentences under the Texas statute that had been applied to him had established a pattern of arbitrariness and discrimination, *see* 593 F.2d at 685 n.26 (panel discussion of issue), and (4) in failing to conclude that certain 'death penalty adverse' veniremen had been unconstitutionally excluded from his jury in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The panel, whose

## I.

The Supreme Court has established that in cases involving multiple confessions courts may hold some of the confessions involuntary and others not only if such a distinction is justified by a sufficiently isolating "break in the stream of events." *E. g., Darwin v. Connecticut,* 391 U.S. 346, 349, 88 S.Ct. 1488, 1489, 20 L.Ed.2d 630 (1968); *Beecher v. Alabama,* 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967); *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967); *Reck v. Pate,* 367 U.S. 433, 444, 81 S.Ct. 1541, 1548, 6 L.Ed.2d 948 (1961); *Leyra v. Denno,* 347 U.S. 556, 561, 74 S.Ct. 716, 719, 98 L.Ed. 948 (1954).[2] My review of the record indicates that no such "break" appears here. Accord-

ing to the record, Jurek made in sequence at least four oral and two written confessions.[3] Judge Garza distinguishes the second written confession, and holds it alone to have been involuntary, on the basis of his conclusion that the police and the prosecutors decided to 'get tough' with Jurek only after they realized that his first—assertedly voluntary—written confession, although sufficient to sustain a conviction for murder, was not sufficient to convict him of capital murder and thus send him to his death.[4] The record, however, refutes this conclusion. It shows that at the time of the second written confession Jurek's questioners believed that they had more than enough evidence to obtain a death verdict.[5] What the record reveals is that

judgment and opinion was automatically vacated by the court's granting of rehearing en banc, *see* 5th Cir. R. 17, found that Jurek's confessions had been coerced, 593 F.2d at 674–79, and that his *Witherspoon* claim had merit, *id.* at 680–85. *See id.* at 685 & n.26 (unnecessary to consider Jurek's other alleged points of error). At the time this case was submitted to the en banc court, there was some question as to whether the *Witherspoon* doctrine applied to Texas' bifurcated capital trial procedure. A case presenting the issue was then pending before the Supreme Court. *See Adams v. Texas,* 444 U.S. 990, 100 S.Ct. 519, 62 L.Ed.2d 419 (1979), *granting cert. to Adams v. State,* 577 S.W.2d 717 (Tex. Cr. App. 1979)(en banc). The Supreme Court has since decided that case and held, as the panel assumed, that the *Witherspoon* doctrine does apply. *Adams v. Texas,* —— U.S. ——, 100 S.Ct. 2521, 64 L.Ed.2d —— (1980).

The record establishes that each of the claims that is considered here—the alleged invalidity of Jurek's confessions under established standards of due process, the Sixth Amendment, and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966)—was raised in, and rejected by, the Texas state courts and the federal district court below.

2. In the cases cited, the Court found no distinction as to voluntariness to have been justified because, as the Court variously phrased its determination, there was "no break in the stream of events" sufficient to isolate one or more of the confessions, *Darwin, Beecher, Clewis*; there were no facts in the record suggesting that the confessions were "independent" acts, *Reck*; or the confessions "[a]ll were simply parts of one continuous process," *Leyra.* Only when a sufficiently isolating break has been established has the Court drawn a distinction. *See United States v. Bayer,* 331 U.S. 532,

540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947) (holding valid second confession made under notably different circumstances six months after first confession that was assumed to have violated *McNabb* rule); *Lyons v. Oklahoma,* 322 U.S. 596, 604, 64 S.Ct. 1208, 1213, 88 L.Ed. 1481 (1944) (holding valid second confession made in new, noncoercive environment to different questioners, a half day after first admittedly involuntary confession, and prior to third admittedly voluntary confession).

3. According to the district attorney in charge of prosecuting Jurek's case, Jurek made at least three oral confessions in Austin the day after Wendy Adams' death, *see* note 7, *infra,* one oral confession later in the day in Cuero, the first written confession late that night, and the second written confession the next afternoon, *see* note 8, *infra.*

4. Under Texas law, Jurek was subject to execution for the death of Wendy Adams only on a finding that he intentionally murdered her "in the course of committing or attempting to commit kidnapping, burglary, robbery, forcible rape, or arson." Tex.Penal Code art. 1257(b)(2). Jurek was tried, and convicted, on the theory that he murdered the girl in the course of committing or attempting to commit kidnapping and/or forcible rape. According to Judge Garza, the prosecution had no evidence, or at least nothing from Jurek himself, to support such a theory until Jurek signed the second written confession. Judge Garza thus contends that the second written confession, as distinguished from those made earlier, was Jurek's "death warrant."

5. The district attorney who conducted the questioning that led to the first and second

the police and prosecutors sought the second written confession for the same reason that they had sought the first: they wanted to obtain from Jurek a signed statement of what they believed to be "the truth."[6] The record demonstrates that each time they learned of some new particular relating to Wendy Adams' disappearance, they went to Jurek and had him revise his 'confession' in order to conform to it. This was true of the three oral confessions that Jurek made in Austin.[7] It was

written confessions testified at a deposition prior to the federal habeas hearing that the drive-for-the-death-penalty theory relied on by Judge Garza "is something [Jurek's trial counsel] I think very capably, argued or tried to put over, but in my opinion there was no question whether it was a capital case in the first statement." The validity of this opinion is established by the record.

Under then Texas law, a girl under the age of fifteen was legally "kidnapped" the moment she was taken from her parents' control, regardless of whether or not she went willingly. Tex. Penal Code art. 1177 ("If the person kidnapped to be under fifteen years of age, it is not necessary that there should be want of consent nor that there should be force in order to constitute kidnapping, and, in such a case, consent of such a minor shall be no defense.") Because Wendy Adams was only ten, the first written confession alone, with its admission that Wendy Adams had been taken from her parents' control and killed, would thus seem to have been sufficient to establish that Jurek had intentionally committed murder in the course of kidnapping and, under Texas law, could be put to death. In fact, the third oral confession, see note 7, infra, containing the same admission, and as admissible at Jurek's trial because it had led to the discovery of Wendy Adams' body, see Tex.Code Crim.Proc. art. 38.22(1)(e) (rules governing admissibility of oral confessions), would on the same theory also seem to have been sufficient, as the district attorney testified, to justify a death verdict. In addition, Jurek's questioners had evidence prior to the second written confession that Wendy Adams had not gone with Jurek willingly. The district attorney testified that before he had obtained either of the two written confessions he had interviewed several of the witnesses who later testified at trial that they had seen Jurek's pickup speeding through Cuero with someone who looked like Wendy Adams in the back screaming for help.

Prior to the second written confession, Jurek's questioners also had evidence about as supportive of a conviction for murder in the course of attempted forcible rape as the second written confession itself. The district attorney testified that prior to taking the second written confession he had questioned a fifteen year old boy named Richard Broz. Broz testified at trial that on the afternoon of Wendy Adams' disappearance, he, Jurek, and a friend named Ricky Phillips had driven to the Cuero city park and that there Jurek had suggested picking up three girls: "Ricky said that they were too young.

And Jerry said no, they were just right." Broz testified that Jurek had then taken him and Phillips to a pool hall, dropped them off, and "said he was going to go back up to the park and get some girls and get some pussy." In addition, the county attorney had already talked to a young girl who testified at trial that she had told him that on the afternoon of Wendy Adams' disappearance she had been at the city park with two friends and that Jurek had tried to pick them up. The second written confession added to the above testimony only the admission that at the river Jurek had asked Wendy Adams to have sex with him, she had said she did not want to, and Jurek for that reason had killed her. It did not add any admission that Jurek had killed the girl in the course of committing or attempting to commit forcible rape.

6. In addition to securing information, one of the principal purposes of coercive questioning is, as the Supreme Court has repeatedly indicated, getting the defendant to admit, preferably in writing, to the police version of the facts of the crime. See, e. g., Clewis v. Texas, 386 U.S. 707, 711–12, 87 S.Ct. 1338, 1340–41, 18 L.Ed.2d 423 (1967) (interrogation "was specifically designed to elicit a signed statement of 'the truth'—and the police view of 'the truth' was made clear to the petitioner"). The Court's voluntariness cases indicate that as part of this process it is not unusual for the police to force the defendant to go through several "drafts" until he, and the police, "get it right." See, e. g., Haynes v. Washington, 373 U.S. 503, 511, 83 S.Ct. 1336, 1341, 10 L.Ed.2d 513 (1963); Watts v. Indiana, 338 U.S. 49, 52–53, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949); Chambers v. Florida, 309 U.S. 227, 232, 60 S.Ct. 472, 475, 84 L.Ed. 716 (1940) (prosecutor when shown defendant's first confession "said something like 'tear this paper up, [this] isn't what I want, when you get something worth while call me' ").

7. Jurek originally denied ever having seen Wendy Adams the day of her disappearance. It was after he was arrested, repeatedly questioned despite his continued denials, see note 15 infra, taken to Austin, subjected to a polygraph examination, and told that the results of the examination proved that he was lying, that he made his first oral confession. He stated in response to police questioning that he had seen Wendy Adams the day of her disappearance

also true of the one oral and two written confessions that Jurek later made in Cuero.[8]

and taken her riding in his truck, but that she had fallen out of the back, he had left her at the place where she fell, which he described, and he had not seen her since. According to the district attorney, a search party was detached to follow "the directions he'd given them to find her by the side of the road and that they did not find her and called back and they supposedly made him aware of that . . . ."

The police then obtained Jurek's second oral confession. He stated in response to additional questioning that the girl had fallen out of the truck and that he had taken her to be dead. He said that he then had loaded her into the back of the truck, getting blood on the truck mat in the process, and had then taken her to the river and thrown her in. An examination of Jurek's truck for bloodstains discredited Jurek's story, and he was subjected to further questioning. The police then obtained Jurek's third oral confession. The particulars of this confession are not set out in the record. All that the district attorney's testimony indicates is that Jurek admitted driving Wendy Adams to the river, killing her or at least rendering her unconscious, and then throwing her body into the river. It was this confession that assertedly focused the search for the girl's body on the Hell's Gate Bridge section of the Guadalupe River and ultimately led to the discovery of the body the next day.

After Jurek made the third confession, the first in which he admitted having committed intentional murder, he was driven back to Cuero.

**8.** On his return to Cuero, the police questioned Jurek again and obtained his fourth oral confession. According to the district attorney, in this confession Jurek "reverted" to his earlier story that Wendy Adams had simply fallen out of the truck and he had left her behind. Although the statement, like Jurek's later written ones, was made after Jurek had been read his rights by a magistrate, cf. Tex.Code Crim.Proc. art. 38.22 (magistrate's warning must be given before any written confession is taken), it was not transcribed. Rather, according to the district attorney, Jurek was reminded of his earlier confession to intentional murder and driven to the area where he claimed Wendy Adams had fallen. The district attorney testified that he then walked around the area with Jurek and explained to him that he was lying. The attorney testified, for example, that

I said where did she fall out and he pointed to a spot to us and I, of course, it was covered up high with Johnson grass and it was, to me, very apparent that there had not been any disturbance much less a body that slid in there and I explained this to him. Jerry, the grass has not been disturbed, and the blood—he explained there would be big blood spots and you could look over in this Johnson grass and see where the blood spots were and he said well, it's bound to be right over in there so the ranger stepped off in there and took the grass and spread it apart and said well, I don't see any blood and so I said, now Jerry, you see?

According to the district attorney, Jurek's response was to say "that his device to throw us off on how it happened had failed and I said, well, do you want to go back to the car then and he said yes, we might as well go back because there is nothing here so we walked back and got in the car and I don't think there were three words said all the way into town."

When they arrived back in town, Jurek was questioned again and the district attorney obtained Jurek's first written confession. In brief, it stated that Jurek had driven Wendy Adams to the river, gotten angry at her for a derogatory comment she made about his family, choked her until she was blue in the face, and then thrown her body into the river. Many of its particulars closely matched bits of evidence Jurek's questioners had garnered in the course of witness interviews conducted earlier in the day. For example, the police had been told by several persons that Wendy Adams had left all of her clothes in the city park bathhouse and that when she had been seen in Jurek's truck she had been wearing only a bathing suit. The confession stated, "We sat on the side of the truck and talked. Wendy was still dressed in her bathing suit that she'd had on when we left the park." The reports of a number of witnesses had also allowed the police to piece together Jurek's route out of town with the girl. An eleven year old girl had already told the county attorney that she had seen Jurek's truck speed by the city skating rink, and a woman who worked for the county as a deputy clerk and who was the wife of a county deputy sheriff had told the district attorney that she had seen Jurek's truck race by her house on Reuss Boulevard and then almost get hit by a big truck. The confession stated, "From the park I drove past the skating rink, turned right at the high school and came down the hill by the cemet[e]ry and went to the Yoakum Highway on what I think was Reuss Blvd.[.] As I came on the Yoakum Highway, a big truck almost hit me . . . ." A worker at the city park "pro shop" who had agreed to look after Wendy Adams and who was the wife of the city police chief had told police that early in the day she had given Wendy permission to visit with some unidentified friends of Wendy who were having a picnic at one of the city park picnic units. The woman remembered that on her return, just prior to her disappearance, Wendy had talked about the visit and said (according to the woman's testimony at trial) that "she liked the mother and the children, but she didn't care much about the father because

does not reveal a "break in the stream of events" from arrest through the time of the second written confession sufficient to base a distinction as to voluntariness.[9]

When the distinction relied on by Judge Garza is discarded, adherence to well-established Supreme Court precedent is all that is necessary to recognize that the 'totality of the circumstances' in this case, determined pursuant to this Court's set duty to make an independent review of the record,[10] fully justifies and requires the conclu-

he drank." The confession stated that the reason Jurek had become angry at and killed Wendy was that "Wendy told me that I shouldn't be drinking, and that I was just like my brother who drinks a lot; and she also told me that my nieces didn't have a good father because he didn't come home to see them much." After Jurek signed the confession he was sent to the Victoria county jail. The district attorney testified that he himself went home and went to bed.

The second written confession was not obtained until late the next day. In the interim, the investigation into Wendy Adams' death continued. The district attorney testified that he had had the feeling all along that sex had been Jurek's motive for the crime but that he could not recall whether at the time of the first written confession he had been aware of any admissible evidence so indicating. He did recall that after the first confession had been taken he had talked for the first time with Richard Broz and Ricky Phillips, Jurek's companions on the day of the girl's disappearance, and had taken witness statements from them. As Broz's trial testimony indicates, the statements established that Jurek's sexual desires had played a central role in the killing. Broz said that Jurek and Phillips had talked about "getting some pussy" and that Jurek, when he had dropped Broz and Phillips off at a pool hall, had said he was going back to the park to "get" some. See note 5, supra. After talking with Broz and Phillips, the district attorney recalled Jurek to Cuero. He testified that the reason for the recall was that "we found out there were parts of the first statement that we felt were incorrect, not true." After further questioning —"I more or less related to him that I felt that a part of his statement was not correct, that I felt that there was sex or things like that involved"—the district attorney obtained the second written confession. Unlike the earlier confessions, it contained references to Jurek's, and Phillips', strong desire to "get some pussy." The confession recanted Jurek's previous statement that he had killed Wendy Adams because she had criticized him and his brother, and stated instead that she had been killed because she had said that she did not want to have sex with him. The district attorney testified that he could not recall whether he had obtained the confession by confronting Jurek with Broz's and Phillips' testimony.

This record establishes that what Judge Garza found to have been true only at the time of the second written confession, viz., that "[t]he disapproval of those in control of [Jurek's] environment had been expressed to him, and they had suggested the direction in which they wished him to travel," had in fact been the case ever since the time of Jurek's arrest.

9. Judge Garza's emphasis on the difference in style of the two written confessions seems to me unjustified. The record indicates that the contrast is attributable not to any difference in the degree of coercion leading to the two confessions but to the fact that the confessions were "transcribed" by two different interrogators. The first was put in writing by the district attorney; the second by the county attorney. Judge Garza's emphasis on the sixteen hour time period separating the two written confessions also seems to me unjustified. The Supreme Court has implied that even a six month time difference may not be enough in and of itself to constitute a sufficiently isolating break between two confessions. United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947). See note 2, supra. Finally, even assuming arguendo that Judge Garza is correct that "there are almost no indicators pointing to an involuntary first confession" but that "[i]n the case of the second, the factors suggesting involuntariness predominate," I would reject his conclusion that that is sufficient justification for holding only the second confession involuntary. See Haynes v. Washington, 373 U.S. 503, 511 n. 8, 83 S.Ct. 1336, 1342 n. 8, 10 L.Ed.2d 513 (1963) (continued questioning of accused after completion of first confession "displays and confirms an official disregard by police . . . of the basic rights of the defendant" and "tends to bear out petitioner's version of what happened earlier"); Chambers v. Florida, 309 U.S. 227, 240, 60 S.Ct. 472, 479, 84 L.Ed. 716 (1940) (police rejection of first confession "because it was found wanting, demonstrates the relentless tenacity which 'broke' petitioners' will and rendered them helpless to resist their accusers further"). See also Haley v. Ohio, 332 U.S. 596, 600, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948).

10. It is settled that in reviewing coerced confession claims the federal courts are "under a duty to make an independent evaluation of the record." Mincey v. Arizona, 437 U.S. 385, 398, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290 (1978) (emphasis added). E. g., Beckwith v. United States,

sion that each of Jurek's confessions was involuntary.[11] In the four decades since *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), the Supreme Court has reviewed the voluntariness of over forty confessions introduced against criminal defendants in state courts. *E. g., Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Spano v. New York*, 360 U.S. 315, 321 n.2, 79 S.Ct. 1202, 1206 n.2, 3 L.Ed.2d 1265 (1959) (citing 28 cases). In so doing, the Court has established a number of indicia of involuntariness. *See, e. g., Schneckloth v. Bustamonte*, 412 U.S. 218, 223–27, 93 S.Ct. 2041, 2045–47, 36 L.Ed.2d 854 (1973). Clearly more than enough of these indicia are present here. As noted above, Jurek made at least six separate confessions. Each was the result of frequent interrogation,[12] carried on by a num-

---

11. 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976); *Boulden v. Holman*, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139, 22 L.Ed.2d 433 (1969); *Clewis v. Texas*, 386 U.S. 707, 708, 87 S.Ct. 1338, 1339, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *Haynes v. Washington*, 373 U.S. 503, 515–16, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963) (emphasis in original); *Spano v. New York*, 360 U.S. 315, 316, 79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 (1959); *Ashcraft v. Tennessee*, 322 U.S. 143, 147–48, 64 S.Ct. 921, 923, 88 L.Ed. 1192 (1944). It is also settled that the federal courts of appeals are not excused from this duty when they sit to review state habeas claims such as Jurek's even though such claims have already been evaluated by a state and a lower federal court. *E. g., Boulden v. Holman*, 394 U.S. at 480, 89 S.Ct. at 1139; *Davis v. North Carolina*, 384 U.S. at 741–42, 86 S.Ct. at 1764 ("[i]t is our duty in this case . . . , as in all of our prior cases dealing with the question whether a confession was involuntarily given, to . . . make an independent determination of the ultimate issue of voluntariness"). Although the opinions of Judge Garza and Judge Brown each acknowledge this duty—Judge Brown's albeit reluctantly, *cf. Mincey v. Arizona*, 437 U.S. at 407–10, 98 S.Ct. at 2421–23 (dissenting views of Rehnquist, J.)—they seem to me to misapprehend it. As the Supreme Court has repeatedly stressed, the question for determination in a voluntariness case is whether coercion appears from the *totality* of the circumstances. *E. g., Boulden v. Holman*, 394 U.S. at 480, 89 S.Ct. at 1139; *Clewis v. Texas*, 386 U.S. at 708, 87 S.Ct. at 1339; *Fikes v. Alabama*, 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957). This question cannot be answered simply by considering, as do Judge Garza and Judge Brown, whether the elements of a prior adjudication of the issue were properly made and weighed. *E. g.,* Judge Garza's opinion at p. 940 ("[h]aving examined each of the factors which have been held [by the panel majority] to taint Jurek's confessions, we proceed to a consideration of their total effect on each confession"). *See also* 5th Cir. R. 17 (panel opinion vacated by granting of rehearing en banc). As the Supreme Court has consistently explained, what is required is a *de novo* examination of the *entire* record. *E. g., Mincey*

*v. Arizona*, 437 U.S. at 401, 98 S.Ct. at 2418 (determination of whether a statement is involuntary "requires careful evaluation of all the circumstances of the interrogation"); *Boulden v. Holman*, 394 U.S. at 480, 89 S.Ct. at 1139; *Clewis v. Texas*, 386 U.S. at 708, 87 S.Ct. at 1339; *Davis v. North Carolina*, 384 U.S. at 741–42, 86 S.Ct. at 1764; *Haynes v. Washington*, 373 U.S. at 513–14, 83 S.Ct. at 1343. In *Boulden*, the Court emphasized its obligation to make "an independent study of the entire record" even though it acknowledged that the two lower federal courts had already evaluated the coercion claim and in so doing had applied "the proper constitutional standards." 394 U.S. at 480, 89 S.Ct. at 1139. *See generally Brookhart v. Janis*, 384 U.S. 1, 4 n.4, 86 S.Ct. 1245, 1247 n.4, 16 L.Ed.2d 314 (1966) (whenever "constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record").

11. Given that there will presumably be a new trial in this case, it is appropriate for the court to rule on the voluntariness of all of Jurek's confessions, not just the two written confessions which were admitted against him at his original trial. *See, e. g., Mincey v. Arizona*, 437 U.S. 385, 396, 98 S.Ct. 2408, 2415, 57 L.Ed.2d 290 (1978); *Boulden v. Holman*, 394 U.S. 478, 479 n.1, 89 S.Ct. 1138, 1139 n.1, 22 L.Ed.2d 433 (1969); *Culombe v. Connecticut*, 367 U.S. 568, 621 n.73, 81 S.Ct. 1860, 1889 n.73, 6 L.Ed.2d 1037 (1961). All of the circumstances of Jurek's interrogation are presently and properly before the court.

12. Jurek was repeatedly questioned from the time of his arrest until the signing of the second confession forty two hours later. He was questioned at least eight times before he made his first confession of guilt. On at least four occasions, he was questioned for over an hour and a half at a time. Repeated or prolonged questioning has been a factor in almost all of the Supreme Court's voluntariness cases. *See, e. g., Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978); *Darwin v. Connecticut*, 391 U.S. 346, 347, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); *Clewis v. Texas*,

ber of questioners,[13] often at odd hours and in secluded places,[14] that continued in the face of Jurek's evident unwillingness to admit guilt.[15] The authorities responsible displayed an intentional disregard of state law.[16] At the time the confessions were

386 U.S 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967); *Fikes v. Alabama*, 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957).

**13.** From the time of his arrest until the time he made his first admission of guilt in Austin, Jurek was questioned by at least seven persons: the two police officers who arrested him and interrogated him at police headquarters [one of whom was the missing girl's father, *see* note 19, *infra* ], the Cuero chief of police, a deputy sheriff, the county attorney, and an unidentified number of polygraph personnel from the Texas department of public safety. When Jurek was returned to Cuero, he was questioned by the district attorney and at least two other police officers and a Texas Ranger. According to the county attorney, Jurek was at times surrounded by as many as six questioners, not including witnesses. Such questioning by, or in front of, a number of persons has been identified by the Supreme Court as tending to have an intimidating effect on an accused. *See, e. g., Blackburn v. Alabama*, 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960); *Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265 (1959); *Harris v. South Carolina*, 338 U.S. 68, 70, 69 S.Ct. 1354, 1355, 93 L.Ed. 1815 (1949); *Ashcraft v. Tennessee*, 322 U.S. 143, 149, 64 S.Ct. 921, 923, 88 L.Ed. 1192 (1944).

**14.** Jurek was questioned from 1:00 a. m. to 2:00 a. m. the night of his arrest, and again at 6:00 a. m. that morning. The second written confession was obtained one evening; the first at 1:15 a. m. after a night of interrogation. Such 'off-hour' questioning has been held to be a coercive circumstance. *See, e. g., Davis v. North Carolina*, 384 U.S. 737, 747, 86 S.Ct. 1761, 1767, 16 L.Ed.2d 895 (1966). *See also Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265·(1959) (where questioning "began in early evening, continued into the night, and did not bear fruition until the not-too-early morning, . . . slowly mounting fatigue does, and is calculated to, play its part").

To prove that Jurek had been lying when he said, contrary to an earlier oral confession, that Wendy Adams had merely fallen out of his truck, *see* note 8, *supra*, the district attorney took Jurek at midnight to a field outside of Cuero where Jurek claimed the fall had occurred and questioned him about it. Such late night excursions to lonely and isolated places have been identified by the Supreme Court as tending to arouse terror in an accused. *Culombe v. Connecticut*, 367 U.S. 568, 622, 81 S.Ct. 1860, 1889, 6 L.Ed.2d 1037 (1961). *See*

*Ward v. Texas*, 316 U.S. 547, 555, 62 S.Ct. 1139, 1143, 86 L.Ed. 1663 (1942); *White v. Texas*, 310 U.S. 530, 533, 60 S.Ct. 1032, 1033, 84 L.Ed. 1342 (1940). In *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), the Court found to have been coercive a similar "trek" designed to break down an accused's alibis. 384 U.S. at 749, 86 S.Ct. at 1768.

**15.** Prior to his first confession of guilt, Jurek denied on at least eight occasions having participated in Wendy Adams' disappearance. Thereafter, under the pressure of police questioning, he confessed guilt only in stages, and not without reversions to previous professions of innocence or lesser culpability. *See*, notes 7 & 8, *supra*. These facts seem to me entirely inconsistent with any hypothesis that Jurek's statements were "the product of his free and rational choice," *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968), that Jurek was "anxious to confess to anybody who would listen," *Stroble v. California*, 343 U.S. 181, 191, 72 S.Ct. 599, 604, 96 L.Ed. 872 (1952), or that he had concluded, independently of any duress by the police, "that it was wise to make a clean breast of his guilt," *Lyons v. Oklahoma*, 322 U.S. 596, 604, 64 S.Ct. 1208, 1213, 88 L.Ed. 1481 (1944). To the contrary, the only reasonable inference is that Jurek did not want to confess. *See Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978); *Reck v. Pate*, 367 U.S. 433, 443–44, 81 S.Ct. 1541, 1548, 6 L.Ed.2d 948 (1961).

**16.** Under Texas law, the police were required to bring Jurek before a magistrate "without unnecessary delay." Tex.Code Crim.Proc. art. 14.06. The purpose of the requirement was to ensure that defendants would be promptly informed of their rights, and given an opportunity to consult counsel and to obtain bail. Tex. Code Crim.Proc. art. 15.17. Jurek was not brought before a magistrate until twenty one hours after his arrest. The state does not contend that this delay was necessary. Nor does it appear that Jurek's questioners were unaware that the delay was unlawful. Every Cuero police officer carried a "*Miranda* card" on which the "without unnecessary delay" requirement was inscribed. Failure to follow such a requirement has been recognized as an important factor in determining voluntariness. *See, e. g., Clewis v. Texas*, 386 U.S. 707, 711, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967); *Culombe v. Connecticut*, 367 U.S. 568, 631–32, 81 S.Ct.

obtained, Jurek was apparently weak from lack of food and sleep,[17] isolated from family, friends, and legal counsel,[18] and in legitimate apprehension of imminent physical

1860, 1894–95, 6 L.Ed.2d 1037 (1961); *Fikes v. Alabama*, 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957); *Haley v. Ohio*, 332 U.S. 596, 598–600, 68 S.Ct. 302, 303–04, 92 L.Ed. 224 (1948). A reasonable inference to be drawn from the failure here is that Jurek's questioners deliberately put off bringing Jurek before a magistrate until they had obtained from him a confession that he had deliberately killed Wendy Adams. *Cf. Turner v. Pennsylvania*, 338 U.S. 62, 64, 69 S.Ct. 1352, 1353, 93 L.Ed. 1810 (1949) ("[w]ith commendable candor the district attorney admitted that a hearing was withheld until interrogation had produced confession"); Tex.Code Crim.Proc. art. 38.22 (magistrate's warning must be given before any *written* confession is taken).

Jurek's questioners also failed to observe state law in transferring Jurek to a jail in a different county. *See* note 19, *infra.* As the Supreme Court had occasion to observe almost forty years ago in a voluntariness case, Texas law provides that if there is no safe jail for the accused in the county in which the prosecution is carried on, a *magistrate* may commit the prisoner to the nearest safe jail in any other county. *Ward v. Texas*, 316 U.S. 547, 553, 62 S.Ct. 1139, 1142, 86 L.Ed. 1663 (1943). *See* Tex.Code Crim.Proc. art. 16.18. Here, as in *Ward*, there is no indication that application was made to a magistrate prior to the transfer. *Cf. Ward v. Texas*, 316 U.S. at 554–55, 62 S.Ct. at 1143 (unlawful handling of transfer motivated by desire to get confession).

Finally, although the record establishes that Jurek was arrested on suspicion of murder, it also establishes that he was formally booked and jailed on an outstanding "hot check" charge. It was not until twenty one hours later, when he was finally brought before the magistrate, that he was charged with murder with malice. *Cf. Culombe v. Connecticut*, 367 U.S. at 632 n.95, 81 S.Ct. at 1895 n.95, *quoting Rex v. Dick*, [1947] 2 D.L.R. 213, 225 ("abuse of process of criminal law to use the purely formal charge of a trifling offence upon which there is no real intention to proceed, as a cover for putting the person charged under arrest, and obtaining from that person incriminating statements . . . .")

Judge Garza does not discuss the effect of this evidence on the application to this case of the principle he invokes that "a presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume they have properly discharged their official duties." *Nash v. Estelle*, 597 F.2d 513, 518 (5th Cir. 1979) (en banc).

**17.** According to police testimony, Jurek, at the time of his first written confession, had had, at most, one meal approximately 18 hours before. He was offered breakfast the morning of his arrest but it is unclear whether he accepted or ate it. He was offered a restaurant meal en route from Austin to Cuero, but the officer accompanying him testified that "[h]e said he didn't want anything. He refused anything to eat or drink." The officer also testified that Jurek was offered a soft drink in Austin, and smoked some cigarettes. *See Davis v. North Carolina*, 384 U.S. 737, 746, 86 S.Ct. 1761, 1767, 16 L.Ed.2d 895 (1966) (record shows no deliberate attempt to starve defendant, but "diet was extremely limited and may well have had a significant effect on Davis' physical strength and therefore his ability to resist"). *See also Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); *Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967); *Payne v. Arkansas*, 356 U.S. 560, 567, 78 S.Ct. 844, 849, 2 L.Ed.2d 975 (1958). How much sleep or rest Jurek had after his arrest is also unclear. The police testimony indicates only that on the night of his arrest he was put in a cell with a bed at 2:30 a. m. and that at 6:00 a. m. he was awake. *See Ashcraft v. Tennessee*, 322 U.S. 143, 151, 153, 64 S.Ct. 921, 924, 925, 88 L.Ed. 1192 (1944) (lack of sleep significant factor in finding confession involuntary, even though witnesses testified that defendant showed no outward signs of being tired or sleepy). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Greenwald v. Wisconsin*, 390 U.S. at 521, 88 S.Ct. at 1154; *Clewis v. Texas*, 386 U.S. at 712, 87 S.Ct. at 1341.

**18.** In the forty two hours from the time of his arrest until the signing of his second written confession, Jurek never saw a member of his family or a friend (other than perhaps Richard Broz who was also under arrest), or consulted with a lawyer. The significance of such isolation in weakening a defendant's resolve has been repeatedly emphasized by the Supreme Court. *See, e. g., Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978); *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); *Davis v. North Carolina*, 384 U.S. 737, 745–46, 86 S.Ct. 1761, 1766–67, 16 L.Ed.2d 895 (1966); *Haynes v. Washington*, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961); *Blackburn v. Alabama*, 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960).

harm.[19] Jurek was not the kind of accused the Supreme Court has identified as capable of withstanding such pressures.[20] To the contrary he was young,[21] poorly educated,[22]

**19.** Wendy Adams' father, James R. Adams, was a Cuero city police officer. He was one of the two police officers who arrested Jurek the night of Wendy's disappearance. According to his partner's testimony, he personally interrogated Jurek that night for at least half an hour. Although there is no evidence in the record establishing that Adams ever injured or threatened to injure Jurek, there clearly was concern that he might do so. As a police officer, Adams had access to the county jail serving Cuero, and at night, as the county sheriff testified, the jail was manned only by a dispatcher. For this reason, Jurek, after his first night of confinement, was transferred to another jail in a different county. As the sheriff testified, "The father of Wendy is a city patrolman. He has access to our jail because we handle city prisoners. I am sure that you have lost a loved one and it affects you. I have. Let's say that we put [Jurek] down there for his own safe keeping."

The record suggests that Jurek was fearful of what Adams might do and terrified of the prospect of spending a second night within his range in the county jail serving Cuero. Witnesses to Jurek's written confessions testified that Jurek appeared "fidgety," "anxious," and "nervous." A number of them recalled that Jurek, although generally "close mouthed" and prone to answer in "monosyllables," became quite animated at the prospect of staying in Victoria, as opposed to Cuero's De Witt, county jail. According to one witness, Jurek "said he wanted to stay in Victoria, that's the most words I heard him say." According to another, "it surprised me . . . he was very emphatic that he wanted to be headquartered in the Victoria jail, rather than the jail here."

The record suggests that Jurek may even have understood that he would be transferred away from the Cuero jail, and officer Adams, only if he confessed to exactly what the district attorney wanted. According to the district attorney, after Jurek (just prior to his first written confession) stuck to his story that Wendy Adams had merely fallen out of his truck, *see* note 8, *supra*, he ordered Jurek sent back to the courthouse coffee room and went to make a phone call. Although the district attorney testified that the purpose of the call was to make arrangements to send Jurek to the Victoria jail, there is no indication that Jurek knew this. What the record suggests is that he believed that he was about to be returned to the jail serving Cuero. According to the district attorney, "Before I got the call made, some of [the police officers] came to me and said Wiley, he wants to talk to you again . . . . [I]t got to where it was comical because every time I went to the phone to call, somebody would say he wants to talk to you." *Cf.* note 16, *supra* (arrangements for Jurek's jail transfer made in violation of state law).

Confessions prompted by fears of personal injury have been held to be involuntary. *See, e. g., Beecher v. Alabama,* 389 U.S. 35, 36, 88 S.Ct. 189, 190, 19 L.Ed.2d 35 (1967); *Payne v. Arkansas,* 356 U.S. 560, 567, 78 S.Ct. 844, 849, 2 L.Ed.2d 975 (1958). *See also Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963) (accused was told that "state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate' "; subsequent confession held involuntary).

**20.** Jurek was not "a college graduate who had attended the first year of law school." *Crooker v. California,* 357 U.S. 433, 435, 438, 78 S.Ct. 1287, 1289, 2 L.Ed.2d 1448 (1958) (possibility of coercion "negated here by petitioner's age, intelligence, and education"). Nor was he "a man of intelligence and business experience," who "answered questions freely and intelligently," and "was at ease, cool, and collected." *Lisenba v. California,* 314 U.S. 219, 229–30, 241, 62 S.Ct. 280, 287, 292, 86 L.Ed. 166 (1941) (defendant's self-possession, coolness and acumen "negatives" view that confessions were coerced). *See Culombe v. Connecticut,* 367 U.S. 568, 625, 81 S.Ct. 1860, 1891, 6 L.Ed.2d 1037 (1961) (defendant in *Lisenba* "bragged immediately before his confession that there were not enough men in the District Attorney's office to make him talk"). Although Jurek had been in trouble with the police before, there is no indication here such as there was in *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), that the experience had toughened his resistance to police pressures. *See Stein v. New York,* 346 U.S. at 186, 73 S.Ct. at 1093 (defendant haggled for terms with officials to whom he confessed; confession held voluntary). In *Stein,* as the Supreme Court stressed, the defendants had had considerable criminal experience. 346 U.S. at 176 n.21, 185–86, 73 S.Ct. at 1093 (each defendant had served a sentence of at least fifteen years in prison; one of the defendants had been convicted of murder; they were "not young, soft, ignorant or timid, . . . inexperienced in the ways of crime or its detection, nor were they dumb as to their rights"). *See also Thomas v. Arizona,* 356 U.S. 390, 394, 401, 78 S.Ct. 885, 887, 891, 2 L.Ed.2d 863 (1958) (in view of defendant's "extensive criminal record," including a five year prison sentence, two other convictions, and several terms in the Navy brig, defendant could not "be thought an impressionable stranger to the processes of law"). Jurek's experience, consisting of some arrests, and possibly—the record does not show—some misdemeanor convictions, was by contrast extremely limited.

**21.** See note 21 on page 951.

**22.** See note 22 on page 951.

highly suggestible,[23] and borderline mentally retarded.[24] In such circumstances, as the Supreme Court has specifically held, the fact that he may have been advised of his constitutional rights, *but see infra*, is of

> He had never been indicted for, much less convicted of, a felony. *See also Culombe v. Connecticut*, 367 U.S. at 625 n.85, 81 S.Ct. at 1891 n.85 (value of defendant's considerable criminal experience as "school for toughening resistance" must be discounted in light of subnormal mental capacities; confession held involuntary).

21. Jurek was twenty two years old, lived at home with his parents, did not have a job, and associated with persons such as Richard Broz who were in their early or middle teens. *See generally Townsend v. Sain*, 372 U.S. 293, 308 n.4, 83 S.Ct. 745, 754 n.4, 9 L.Ed.2d 770 (1963) (youth relevant to voluntariness determination); *Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961) (same); *Haley v. Ohio*, 332 U.S. 596, 599–601, 68 S.Ct. 302, 303–04, 92 L.Ed. 224 (1948) (same).

22. Although there is some confusion in the record, Jurek apparently repeated the first, fourth or fifth, and sixth grades, and dropped out of school at sixteen in the middle of the seventh. A doctor who tested Jurek's reading skills testified at the federal habeas hearing that Jurek performed at a third grade level, such as would be expected of an average eight or eight and a half year old. The Supreme Court has repeatedly recognized such educational deficiencies as a factor relevant in determining voluntariness. *See e. g., Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); *Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina*, 384 U.S. 737, 742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *Harris v. South Carolina*, 338 U.S. 68, 70–71, 69 S.Ct. 1354, 1356, 93 L.Ed. 1815 (1949); *Ward v. Texas*, 316 U.S. 547, 555, 62 S.Ct. 1139, 1143, 86 L.Ed. 1663 (1942).

23. The record establishes a consensus among the witnesses to the signing of Jurek's two confessions and among the doctors who testified at Jurek's trial and at the federal habeas hearing that Jurek never made small talk and seldom volunteered any statement, but that he would respond to specific questions. According to the doctors who examined him, he would, in the words of the state's doctor, "be willing to say anything just to get over the question." This behavior was labelled "passive dependent" or "passive and compliant." As one doctor explained at the federal habeas hearing:

> . . . [A] person with the kind of deficits that [Jurek] has is constantly coming into situations practically with everyone else that

little significance. *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); *Beecher v. Alabama*, 389 U.S. 35, 37 n.4, 88 S.Ct. 189, 190 n.4, 19 L.Ed.2d 35 (1967); *Fikes v. Alabama*, 352 U.S. 191,

> he deals with in which they're talking in a language and in a way that he is not familiar with and does not understand completely, and I think, as a personality style, rather than stopping and questioning every word and making sure that he understood each word, that on a daily basis he would become very, very confused, people couldn't relate to him, they would think he was dumb and stupid or something, so he sort of adapted the life style of pretending to know things when sometimes he did not.

As another doctor summarized, Jurek had a "tendency to say 'Yes' to things rather than to say 'No.'" *Compare, e. g., Culombe v. Connecticut*, 367 U.S. 568, 621, 625, 81 S.Ct. 1860, 1888, 1891, 6 L.Ed.2d 1037 (1961) (confession of "suggestible" defendant held involuntary); *Fikes v. Alabama*, 352 U.S. 191, 193, 198, 77 S.Ct. 281, 282, 285 (1957) (same; "circumstances of pressure applied against the power of resistance of this petitioner, who cannot be deemed other than weak of will or mind, deprived him of due process of law").

24. The district court found, consistent with the testimony of the doctors at Jurek's trial and at the federal habeas hearing, that Jurek "is an individual of below-average intelligence, mildly retarded, with possible organic brain damage." IQ tests established that overall Jurek was "dull normal," with respect to mechanical ["performance"] intelligence he was roughly average, and with respect to "verbal" intelligence he was "in the bottom one percent" or "mildly retarded." According to the doctors who testified, Jurek was unable, for example, to recite the alphabet, give change for a dollar, say how many weeks there are in a year, or remember which month comes before November. Mental deficiencies of this sort have been recognized as "highly material" in a number of Supreme Court cases finding confessions involuntary. *Fikes v. Alabama*, 352 U.S. 191, 193, 196, 77 S.Ct. 281, 282, 284, 1 L.Ed.2d 246 (1957) (defendant of "low mentality, if not mentally ill"). *See, e. g., Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967) ("mental capacity decidedly limited"); *Culombe v. Connecticut*, 367 U.S. 568, 620, 628, 81 S.Ct. 1860, 1888, 1892, 6 L.Ed.2d 1037 (1961) ("high moron"); *Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961) ("subnormal intelligence"); *Payne v. Arkansas*, 356 U.S. 560, 567, 78 S.Ct. 844, 849, 2 L.Ed.2d 975 (1958) ("mentally dull"). *See also Townsend v. Sain*, 372 U.S. 293, 308 n.4, 83 S.Ct. 745, 754 n.4, 9 L.Ed.2d 770 (1963) (relevant that defendant was "near mental defective").

193, 77 S.Ct. 281, 282, 1 L.Ed.2d 246 (1957).[25] The authorities did not literally beat Jurek's confessions out of him, one of the few indicia of involuntariness not here present, but "the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). With due regard for the Supreme Court's admonition that inquiry into the issue of voluntariness "requires more than a mere color-matching of cases," *Reck v. Pate,* 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948 (1961), a realistic appraisal of the circumstances of this case has compelled me to conclude that each of Jurek's confessions was coerced. Due process of law requires that statements so obtained cannot be used in any way against a defendant at his trial. *Mincey v Arizona,* 437 U.S. at 402, 98 S.Ct. at 2419. The admission of Jurek's two written confessions was, for this reason, constitutional error.

## II.

It also seems to me plain that Jurek's confessions were obtained in violation of his Sixth Amendment right to counsel. As the Supreme Court recently reiterated, it is well established that under the Sixth Amendment, "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977); *McLeod v. Ohio,* 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).[26] Here there is no doubt that Texas had initiated adversary proceedings against Jurek at least prior to the two written confessions.[27] Nor is there any

**25.** The defendant in *Sims* had been in police custody for over eight hours, had not been fed, was isolated from family, friends and counsel, was illiterate, and had a decidedly limited mental capacity. 389 U.S. at 407, 88 S.Ct. at 525. The Court concluded that "[u]nder such circumstances the fact that the police may have warned petitioner of his right not to speak is of little significance." 389 U.S. at 407, 88 S.Ct. at 525. In *Beecher* and *Fikes,* the Court also held confessions to be involuntary even though they had allegedly been preceded by repeated warnings to the defendants of their constitutional rights. *Beecher v. Alabama,* 389 U.S. at 37 n.4, 88 S.Ct. at 190 n.4; *Fikes v. Alabama,* 352 U.S. at 193, 77 S.Ct. at 282. The Court ruled in *Fikes* that a police captain's "testimony that he repeatedly advised petitioner 'that he was entitled to counsel and his various rights' must be viewed in the light of the facts concerning petitioner's mentality and experience . . . ." 352 U.S. at 193, 77 S.Ct. at 282. *See also Davis v. North Carolina,* 384 U.S. 737, 751, 86 S.Ct. 1761, 1769, 16 L.Ed.2d 895 (1966) (confession held involuntary despite the fact that it contained "the standard disclaimer that the confession was free and voluntary"); *Haynes v. Washington,* 373 U.S. 503, 512–13, 83 S.Ct. 1336, 1342, 10 L.Ed.2d 513 (1963) ("substantial doubt as to probative effect to be accorded recitations in the challenged confession that it was not involuntarily induced"); *Haley v. Ohio,* 332 U.S. 596, 601, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948) ("cannot give any weight to recitals which merely formalize constitutional requirements").

**26.** *See generally Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *United States v. Wade,* 388 U.S. 218, 223–27, 87 S.Ct. 1926, 1930–32, 18 L.Ed.2d 1149 (1967); *Powell v. Alabama,* 287 U.S. 45, 47, 53 S.Ct. 55, 56, 77 L.Ed. 158 (1932). *See also Escobedo v. Illinois,* 378 U.S. 478, 490, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964). As the Court stated in *Wade,* "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." 388 U.S. at 226, 87 S.Ct. at 1932 (footnote omitted). As the Court explained in *Massiah,* quoting a concurring opinion in *Spano v. New York,* 360 U.S. 315, 326, 79 S.Ct. 1202, 1209, 3 L.Ed.2d 1265 (1959), "[a]nything less . . . might deny a defendant 'effective representation by counsel at the only stage where legal aid and advice would help him.'" 377 U.S. at 204, 84 S.Ct. at 1202. The right to counsel includes, of course, the right to appointed counsel. *See, e. g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

**27.** Prior to the interrogation sessions that produced the two written confessions, Jurek had been brought before a magistrate, formally charged with "murder with malice," and denied bail. There can be no question that adversary proceedings can be said to have commenced against Jurek at least at the time of this appearance. As the Supreme Court stated in *Brewer,*

There has occasionally been a difference of opinion within the Court as to the peripheral

doubt that the confessions came in the course of government interrogation. Jurek was thus plainly entitled to the assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments. What the state contends, and what Judge Garza and Judge Brown apparently conclude, is that Jurek waived this right. After a review of the record, I simply cannot agree.

It is settled that, in order for a state to be able to introduce under an assertion of waiver, statements obtained from an accused who was entitled to but did not have assistance of counsel, it is incumbent upon the state to prove "an intentional relinquishment or abandonment of a known right or privilege." *Brewer v. Williams*, 430 U.S. at 404, 97 S.Ct. at 1242; *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). As the *Brewer* Court emphasized, this is not a standard of

proof to be taken lightly: courts are to "indulge in every reasonable presumption against waiver." 430 U.S. at 404, 97 S.Ct. at 1242. *E. g., Brookhart v. Janis*, 384 U.S. 1, 4, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966); *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942); *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023.[28] It seems to me clear that the state has not satisfied this standard here. The record fails to show that Jurek ever understood, much less waived, his right to counsel. When he was taken before the magistrate, charged with "murder with malice," and read his rights, Jurek told the magistrate that he could not afford a lawyer and that one would have to be appointed for him.[29] The magistrate's response was to tell him that he had a right to appointed counsel at trial.[30] The later *Mi-*

scope of this constitutional right [to assistance of counsel]. But its basic contours, which are identical in state and federal contexts, are too well established to require elaboration here. Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—"whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

430 U.S. at 398, 97 S.Ct. at 1239 (citations omitted).

28. The *Brewer* Court reiterated that "the right to counsel does not depend upon a request by the defendant." 430 U.S. at 404, 97 S.Ct. at 1242; *Carnley v. Cochran*, 369 U.S. 506, 513, 82 S.Ct. 884, 888, 8 L.Ed.2d 70 (1962). To the extent that the opinions of Judge Brown and Judge Garza imply differently, that absent a request ("clear" or otherwise) waiver may be presumed, that implication is simply incorrect. As the Supreme Court stated in *Carnley*,

Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.

369 U.S. at 516, 82 S.Ct. at 890. *See also Brewer v. Williams*, 430 U.S. at 404, 97 S.Ct. at 1242 ("strict standard" of waiver not limited to alleged waivers at trial; applies equally to alleged waiver of right to counsel during police interrogation).

It should also be noted that there is some question whether an accused, acting on his

own without assistance or consent of counsel, may ever waive the right to have counsel present at police interrogations conducted after the commencement of adversary proceedings. *See Brewer v. Williams*, 430 U.S. at 405–06 & n.11, 97 S.Ct. at 1243 & n.11 (citing cases). The Supreme Court raised the issue in *Brewer* but, presumably in light of its holding that waiver in that case even if legally possible had not in fact occurred, did not decide it. 430 U.S. at 405–06, 97 S.Ct. at 1243. *But see id.* at 413, 97 S.Ct. at 1246 (Powell, J., concurring) (contending that the Court did decide the issue). *Cf. Faretta v. California*, 422 U.S. 806, 836, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (defendant has a constitutional right to conduct his own defense). Judge Garza and Judge Brown do not address this issue.

29. Jurek's appearance before the magistrate was attended only by Jurek and the magistrate. No transcript was made of what was said. The magistrate testified that Jurek told him "that he could not afford a lawyer and the Court would have to appoint him one."

30. The magistrate testified, without contradiction, that when Jurek said that he could not afford a lawyer and that one would have to be appointed for him, he responded: "I told him, I explained to him, I said, 'When you go into the court, why, the District Court, you have to have an attorney to represent you.' And so, I explained to him, and which he said he understood it . . . ."

The preoccupation of Judge Garza, Judge Brown and the district court with whether this response constituted a denial of an unequivocal

*randa* warnings testified to by the police notwithstanding, this response would have been likely to mislead a person of normal intelligence.[31] It seems almost certain that it would have misled or at least impermissibly confused a person as poorly educated, suggestive and mentally deficient as Jurek.[32] In light of the lack of any evidence in the record demonstrating that Jurek was finally made to understand that he did not have to be able to pay to obtain immediate constitutional protection, and that he was entitled to court-appointed counsel not just at trial but prior to any questioning, it simply cannot be said that the state has proved that Jurek ever made the knowing and intelligent waiver of his right to counsel that the Sixth Amendment required.[33] The admission of the two written confessions was, for this reason as well, constitutional error.

## III.

For much the same reason, it also seems to me plain that Jurek's confessions were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[34] In *Miranda,* the Supreme Court established procedural safeguards for the protection of an accused's Fifth Amendment right not to be compelled to incriminate himself. 384 U.S. at 441–42, 86 S.Ct. at 1611. *See, e. g., Brewer v. Williams,* 430 U.S. 387, 397, 97 S.Ct. 1232, 1238, 51 L.Ed.2d 424 (1977); *Michigan v. Tucker,* 417 U.S. 433, 438, 94 S.Ct. 2357, 2360, 41 L.Ed.2d 182 (1974). *Miranda* requires that prior to any custodial police questioning an accused

request for counsel within the meaning of *Nash v. Estelle,* 597 F.2d 513, 517 (5th Cir. 1979) (en banc) (unequivocal request for counsel, if disregarded, acts as absolute bar to further questioning of uncounseled accused), *see Blasingame v. Estelle,* 604 F.2d 893 (5th Cir. 1979), *United States v. Priest,* 409 F.2d 491 (5th Cir. 1969), misses the more important, threshold point that the response was a singularly inadequate explanation of the scope of Jurek's Sixth Amendment right. *See* note 26, *supra* (defendant against whom adversary proceedings have been initiated has right to appointed counsel prior to any questioning). The magistrate's evidently limited understanding of the extent of Jurek's right to appointed counsel may be attributable to the fact that Jurek's case was the first in which the magistrate had ever been called on to make an appointment. In eventually making the appointment, as in the conduct of virtually all other aspects of his duty in this case, the magistrate testified that he acted at the instance of the prosecuting attorneys.

31. Coming as it did from a judicial officer in response to what must at least be characterized as a request for interpretative assistance, the magistrate's statement appeared definitive.

32. *See* notes 22, 23 & 24, *supra.* As the Supreme Court established in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the background of the accused is an important element in the determination of whether there has been an intelligent waiver of the right to counsel. *See generally Culombe v. Connecticut,* 367 U.S. 568, 632, 81 S.Ct. 1860, 1895, 6 L.Ed.2d 1037 (1961) (if mentally deficient defendant had been originally charged with murder instead of a misdemeanor "[c]ertainly . . . no court would have failed to

warn [him] of his rights and arrange for appointment of counsel").

There was medical testimony in this case, albeit disputed, that Jurek was incapable of understanding the *Miranda*-type warning printed at the top of his confession form even when that warning was read to him aloud. The state's doctor testified without contradiction that it was questionable that Jurek had the ability to understand words such as "indigent" or "counsel."

33. All that the record establishes is that, after Jurek's appearance before the magistrate, his right to an attorney was recited to him on a number of occasions and he responded that he did not want a lawyer at that time. Because it is clearly reasonable to presume, *see supra,* even more so in light of Jurek's mental deficiencies, that the motivation for Jurek's response was a misimpression left by the misleading statement of the magistrate, the record simply does not show, as it must, that Jurek was offered counsel but intelligently and understandingly rejected the offer. *E. g., Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962) ("Anything less is not waiver.") *See North Carolina v. Butler,* 441 U.S. 369, 373 n.4, 99 S.Ct. 1755, 1757 n.4, 60 L.Ed.2d 286 (1979).

34. For a comparison of the doctrines of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), see, for example, Kamisar, *Brewer v. Williams, Massiah,* and *Miranda*: What is "Interrogation"? When Does it Matter?, 67 Geo.L.J. 1 (1978).

must be adequately informed of and waive his right to remain silent and his right to retained or appointed counsel. If this requirement is not fulfilled, the prosecution is barred from using any of the accused's responses at trial as part of its case in chief. 384 U.S. at 444, 86 S.Ct. at 1612. *See, e. g., Michigan v. Mosley,* 423 U.S. 96, 99–100, 96 S.Ct. 321, 324, 46 L.Ed.2d 313 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The Supreme Court has repeatedly emphasized that waiver of the *Miranda* rights is not to be lightly inferred. In asserting waiver, the prosecution's burden is great. *E. g., Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980); *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628.[35]

As the previous discussion of Jurek's alleged Sixth Amendment waiver makes clear, the state has failed to carry this burden here. The record fails to establish that Jurek understood, much less waived, his right to appointed counsel prior to any questioning. It indicates only that he was made to understand that he had a right to appointed counsel at trial. As a result, *Miranda* barred the state from introducing any of Jurek's confessions at trial as part of its case in chief. The admission of the two

written confessions was, for this reason as well, constitutional error.

## IV.

Our judicial heritage is rich in the recognition that no matter how severe the crime, the law controls its investigation, its prosecution, and, as we sit here, its review. *See, e. g., Bumper v. North Carolina,* 391 U.S. 543, 550 n.16, 88 S.Ct. 1788, 1792 n.16, 20 L.Ed.2d 797 (1968); *Davis v. North Carolina,* 384 U.S. 737, 739, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895 (1966); *Spano v. New York,* 360 U.S. 315, 320–21, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265 (1959); *Olmstead v. United States,* 277 U.S. 438, 479, 485, 48 S.Ct. 564, 572, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting); *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886).[36] As the Supreme Court recently stated in an opinion reversing the conviction of a defendant 'clearly guilty' of the "senseless and brutal" murder of a ten year old girl:

> The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child. But it is precisely the predictability of those pressures

---

**35.** In *Tague,* the Court held that the following passage from *Miranda* "clearly stated the principles that govern once the required warnings have been given":

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois,* 378 U.S. 478, 490, n.14 [84 S.Ct. 1758, 1765, n.14, 12 L.Ed.2d 977]. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is

rightly on its shoulders. 384 U.S. 436, 475 [86 S.Ct. 1602, 1628, 16 L.Ed.2d 694].

444 U.S. at 470, 100 S.Ct. at 653. In *North Carolina,* the Court stated that "[t]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great . . . ." 441 U.S. at 373, 99 S.Ct. at 1757.

**36.** With particular relevance to this case, the Supreme Court has repeatedly stressed that the question of whether a confession was voluntary is to be answered without regard to whether the confession was true or false, or the defendant guilty or innocent. *E. g., Michigan v. Tucker,* 417 U.S. 433, 448 n.23, 94 S.Ct. 2357, 2366 n.23, 41 L.Ed.2d 182 (1974); *Davis v. North Carolina,* 384 U.S. 737, 739, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895 (1966); *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964); *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). To hold otherwise, that the police have a right to coerce confessions out of 'guilty' defendants, would be to return to the days of the rack and screw.

that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.

*Brewer v. Williams*, 430 U.S. 387, 406, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977).

Jurek may not have been entitled to a perfect trial. *See, e. g., Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). But he was entitled to a fair one. U.S.Const. Amends. V, VI & XIV.

For the reasons set out above, I concur in the court's judgment that the case must be reversed and remanded with instructions to the district court to issue the writ. I dissent from Judge Garza's conclusion that only one of Jurek's confessions was constitutionally defective.

JOHN R. BROWN, Circuit Judge, with whom COLEMAN, Chief Judge, AINSWORTH, CHARLES CLARK, GEE, TJOFLAT, HILL, FAY, VANCE, HENDERSON and REAVLEY, Circuit Judges, join, concurring in part and dissenting in part:

This case presents in dramatic terms the tensions between promoting thorough and efficient enforcement of the laws and ensuring that the rights of the accused are scrupulously guarded. We have on the one hand a murder which could hardly have been more reprehensible; the violent, senseless slaying of a young girl. On the other hand, we have a decision by a panel of this Court throwing out Jurek's two written confessions on the grounds of voluntariness, making it very unlikely that Jurek could again be convicted on retrial.

Recognizing the importance of this case, we decided to review the panel decision en banc. A majority of the en banc Court, through a series of opinions, now concludes that the first written confession was properly admitted into evidence but that the second one was not. Judge Garza's opinion, although embraced in its entirety by only 3 other Judges, thus represents the result reached by a majority of this Court.

We concur in Judge Garza's opinion with respect to the first confession but must dissent from his view with respect to the second one. In our view, the similarities in the circumstances surrounding the two confessions are striking, while the differences are inconsequential.

Since our analysis of this case is shaped by the standard of review we adopt, the proper standard of review is the threshold issue before us. In our view, neither the panel opinion nor Judge Garza's opinion gives this issue thorough enough consideration.

After discussing the standard of review issue, we consider the circumstances common to the two confessions, indicating our disagreement with the panel opinion. Next, we focus on the first confession, examining factors supporting voluntariness not emphasized in Judge Garza's opinion. We then focus on the second confession and attempt to demonstrate that most—if not all—of the distinctions between the two confessions emphasized by Judge Garza disappear upon close analysis. And any factual differences that remain clearly do not support a distinction of constitutional magnitude.[1]

### Objective Of This Concurring/Dissenting Opinion

The aim of this concurring/dissenting opinion is to support fully with additional reasons and considerable factual record material the eminently correct decision of Judge Garza holding the first confession admissible, and, by way of dissent, to demonstrate, again by analysis and full factual material, the incorrectness of his determination that the second confession was inadmissible.

### I. Standard Of Review

The members of this concurring/dissenting opinion do not take a firm stand concerning the proper standard of review.

---

1. Like the other opinions, this opinion does not consider the claim that the exclusion of certain veniremen at trial violated the rule of *Wither-*

*spoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Many Circuit Court cases suggest that the District Court's findings that the two confessions were voluntary are findings of ultimate fact reviewable under the "clearly erroneous" standard.[2] F.R.Civ.P. 52(a).[3] However, the standard of review may not be quite so confined. Under Supreme Court precedent, we may be required to make an "independent review" of the record.[4] In any event, as the following discussion demonstrates, the two standards are as a practical matter not that different. And all joining in this opinion agree that under either the "clearly erroneous" or the "independent review" standard, Jurek's written confessions were voluntary.

### A. Clearly Erroneous Standard

Until the panel opinion in this case, *Jurek v. Estelle*, 593 F.2d 672 (5th Cir. 1979), this Circuit had consistently held that in reviewing a Federal District Court's denial of habeas corpus in a state criminal case, the "clearly erroneous" standard of F.R.Civ.P. 52(a) applies not only as to the individual subsidiary findings of fact but even as to the ultimate question of the voluntariness of the confession. See, e. g., *Hyde v. Massey*, 592 F.2d 249, 250 (5th Cir. 1979); *United States ex rel. Young v. Wainwright*, 490 F.2d 96, 97 (5th Cir. 1974); *Edwards v. Beto*, 446 F.2d 18, 19 (5th Cir. 1971); *Mobley v. Smith*, 443 F.2d 846, 848 (5th Cir. 1971); *Cook v. Beto*, 425 F.2d 1066, 1067 (5th Cir. 1970), *cert. denied*, 400 U.S. 944, 91 S.Ct. 248, 27 L.Ed.2d 249 (1970). But *cf. Davis v. Heyd*, 479 F.2d 446, 450 (5th Cir. 1973) (suggesting in dictum that the question of voluntariness of confession is one of law, not of fact). Similarly, most of the other Circuits that have considered the matter have also concluded that the "clearly erroneous" standard is the proper one in reviewing the District Court's finding in a habeas case concerning the voluntariness of a confession. See, e. g., *United States ex*

*rel. Delle Rose v. LaVallee*, 468 F.2d 1288, 1290 (2d Cir. 1972), *rev'd and rem. on other grounds*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637, *cert. denied*, 414 U.S. 1014, 94 S.Ct. 380, 38 L.Ed.2d 251 (1973); *United States ex rel. Jefferson v. Follette*, 438 F.2d 320, 322 (2d Cir. 1971); *Outing v. North Carolina*, 383 F.2d 892, 896 (4th Cir. 1967); *United States ex rel. Crump v. Sain*, 295 F.2d 699, 701 (7th Cir. 1961), *cert. denied*, 369 U.S. 830, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962); *Cranor v. Gonzales*, 226 F.2d 83, 94 (9th Cir. 1955), *cert. denied*, 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816 (1956). *Cf. United States v. Johnson*, 608 F.2d 725, 730 (9th Cir. 1979) (applying clearly erroneous standard on direct appeal in a federal criminal case). But see, e. g., *Makarewicz v. Scafati*, 438 F.2d 474, 477 (1st Cir. 1971), *cert. denied*, 402 U.S. 980, 91 S.Ct. 1685, 29 L.Ed.2d 145 (1971) (an appellate Court must make an independent determination on the ultimate issue of voluntariness); *Outing v. North Carolina, supra*, 383 F.2d at 914–15 (Frank Kaufman, D. J., dissenting) (arguing that clearly erroneous standard should not apply to determination of "psychological facts" and their legal significance); *Collins v. Beto*, 348 F.2d 823, 832 (5th Cir. 1968) (Friendly, J., sitting by designation, concurring) (arguing that clearly erroneous standard does not apply to evaluation of "psychological facts"); *Bell v. Patterson*, 402 F.2d 394, 396 (10th Cir. 1968), *cert. denied*, 403 U.S. 955, 91 S.Ct. 2279, 29 L.Ed.2d 865 (1971) (appellate Court must make an independent determination on the ultimate issue of voluntariness).

The many cases applying the "clearly erroneous" standard to the ultimate question of voluntariness view that question as simply one of fact to be determined on the basis of subsidiary facts. There is at least some Supreme Court authority for the proposition that voluntariness is a question of fact. In *Schneckloth v. Bustamonte*, 412

---

**2.** See Part IA of this opinion, *infra*, pp. 957–958.

**3.** F.R.Civ.P. 52(a) provides:
Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be

given to the opportunity of the trial court to judge of the credibility of the witnesses.

**4.** See Part IB of this opinion, *infra*, pp. 958–962.

U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), a case involving whether consent to search was voluntarily given, the Court stated that "voluntariness is a *question of fact* to be determined from all the circumstances." *Id.* at 248–49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875 (emphasis added).[5] And while we can uncover no Supreme Court case holding that the "clearly erroneous" rule applies in voluntariness of confession cases (habeas or otherwise), the Supreme Court has held that the "clearly erroneous" rule applies in other types of habeas cases. E. g., *Wade v. Mayo*, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647 (1947) (determination by District Court that inexperienced youth was incapable of self-representation at trial is a question of fact subject to the "clearly erroneous" rule).

Under the "clearly erroneous" rule, we may not reverse a finding unless, after reviewing the evidence, the Court "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). We do not weigh the evidence *de novo* and may not set aside findings merely because on the same evidence we might have reached a different result. See Wright & Miller, Federal Practice and Procedure § 2585, pp. 732–33 (1971), and the cases cited therein.

Some Courts and commentators take the position that the clearly erroneous rule should apply to all findings of fact—not only when credibility choices are involved, but also when the District Court's findings are based on inferences from documents, transcripts or undisputed facts. See generally *id.* § 2587, pp. 740–48. However, this is not the rule in the Fifth Circuit. A recent en banc decision confirms that the clearly

erroneous rule does not apply with respect to inferences drawn from transcripts, *Nash v. Estelle*, 597 F.2d 513, 518 (5th Cir. 1979), and our rule is likewise with respect to documents and undisputed facts. E. g., *Robinson v. Vollert*, 602 F.2d 87, 92 n.8 (5th Cir. 1979); *Hillard v. C.I.R.*, 281 F.2d 279, 282 (5th Cir. 1960).[6]

There are sound policy reasons in support of the use of the "clearly erroneous" review standard in reviewing the ultimate finding of voluntariness of a confession. That determination usually depends largely on testimonial evidence. The State Trial Court, the State habeas Court, and the Federal District Court are, unlike an appellate Court, in the proper position of viewing the demeanor and judging the credibility of the witnesses. Moreover, the "clearly erroneous" rule as it is applied in this Circuit does not apply to inferences drawn from documents, transcripts, or undisputed facts. Thus, the rule is not used where it is not useful: in situations where the reviewing Court is in the same position to review the evidence as the Court below.

### B. Independent Review Standard

A mechanical use of the "clearly erroneous" standard in habeas cases involving the voluntariness of a confession may be inconsistent with Supreme Court precedent. Furthermore, there may be policy reasons favoring a somewhat more active review standard when fundamental constitutional rights are at stake.

The panel opinion states:

We are, according to the Supreme Court, under a "duty [as] an appellate court . . . 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness,' "

---

**5.** As the discussion below indicates, however, many other Supreme Court cases recognize—at least implicitly—that the determination of whether a confession is voluntary presents a mixed question of law and fact.

**6.** A very recent (post-*Nash*) case may appear to suggest that the clearly erroneous rule *does* apply to inferences from documents, transcripts, and similar evidence. *Green v. Russell*

*County*, 603 F.2d 571 (5th Cir. 1979). However, *Green* also suggests that even though the rule applies, it does not apply with full force: "[T]he burden of establishing clear error is not so heavy as in the normal case . . .." *Id.* at 573. In any event, to the extent that *Green* appears to be in conflict with *Nash*, we believe that the rule in *Nash* applies to constitutional claims by criminal defendants.

*Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976), *quoting Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); see also *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290 (1978); in other words, we may overturn the district court's conclusion on this issue even if it is not clearly erroneous.

593 F.2d at 677 (emphasis added). This brief comment does not explain the three-phase review process articulated by the Supreme Court and described below. Moreover, the panel never considers whether the Supreme Court standard applies in the habeas corpus context.[7] After first arguing that the Supreme Court's "independent review" standard may very well apply in habeas cases, we proceed to flesh out the precise content of that standard.

*i*

The Supreme Court, in articulating the standard of review governing voluntariness of confession cases, has rarely explicitly differentiated between cases on direct appeal from state Courts and cases reviewing Federal Court decisions on habeas corpus. However, the Supreme Court habeas cases strongly suggest that the same standard applies. For instance, in *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), the Court was faced with a habeas appeal from the District Court and the United States Court of Appeals in a state criminal case. The issue was the voluntariness of the confession. The Court applied the same standard of review that it had consistently applied in direct appeals from state Courts:

[The] factual allegations were resolved against Davis by the District Court and we need not review these specific findings here.

It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confession was invol-

untarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness. [Citing authority.]

Id. at 741–42, 86 S.Ct. at 1764, 16 L.Ed.2d at 898. See also *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Thomas v. Arizona*, 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863 (1958); *Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1953). Cf. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Townsend v. Sain*, 372 U.S. 293, 316, 83 S.Ct. 745, 758, 9 L.Ed.2d 770, 787 (1963).

These cases strongly suggest that the "clearly erroneous" test may not be the correct test in analyzing the voluntariness of confessions, even in the habeas corpus context. Indeed, a number of Circuit Judges have felt bound by these Supreme Court cases when reviewing habeas appeals from the Federal District Court. See, e. g., *Makarewicz v. Scafati, supra*; *Outing v. North Carolina, supra* (Frank Kaufman, D. J., dissenting); *Collins v. Beto, supra* (Friendly, J., sitting by designation, concurring); *Bell v. Patterson, supra*. On the other hand, the cases applying the "clearly erroneous" rule do not even try to distinguish such cases as *Davis v. North Carolina, supra*, and, indeed, do not even hint at the possibility that the Supreme Court may require a standard of review broader than that of clearly erroneous. See the cases applying the clearly erroneous rule, cited on, p. 957 of this opinion. Because of the strong possibility that the Circuit Courts are required to make an "independent review" of the evidence in habeas appeals, we believe it necessary to consider the "independent review" test in some detail.

*ii*

The Supreme Court has iterated and reiterated its "independent review" test on numerous occasions. See, e. g., *Chambers v. Florida*, 309 U.S. 227, 229, 60 S.Ct. 472, 473, 84 L.Ed. 716, 718 (1940); *Lisenba v. Califor-*

---

7. This is particularly surprising in light of Chief Judge Coleman's apparent assumption in his dissent that the "clearly erroneous" standard applies even with respect to the ultimate question of voluntariness. See 593 F.2d at 685–86.

*nia,* 314 U.S. 219, 237–40, 62 S.Ct. 280, 290–91, 86 L.Ed. 166, 180–82 (1941); *Ashcraft v. Tennessee,* 322 U.S. 143, 147–48, 64 S.Ct. 921, 923, 88 L.Ed. 1192, 1196 (1944); *Gallegos v. Nebraska,* 342 U.S. 55, 61–63, 72 S.Ct. 141, 145–146, 96 L.Ed. 86, 92–93 (1951); *Blackburn v. Alabama,* 361 U.S. 199, 205, 80 S.Ct. 274, 279, 4 L.Ed.2d 242, 247 (1960); *Haynes v. Washington,* 373 U.S. 503, 516–17, 83 S.Ct. 1336, 1344–45, 10 L.Ed.2d 513, 522–23 (1963); *Davis v. North Carolina, supra,* 384 U.S. at 741–42, 86 S.Ct. at 1764, 16 L.Ed.2d at 898; *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290, 304 (1978). By far the Court's most comprehensive analysis on the subject is Mr. Justice Frankfurter's opinion in *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).[8] As the opinion makes clear, the determination of whether a confession is voluntary involves a three-part analysis:

> The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, "phenomenological" occurrences and events surrounding the confession. Second, because the concept of "voluntariness" is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, "psychological" fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also,

comprehend both induction from, and anticipation of, factual circumstances.

Id. at 603, 81 S.Ct. at 1879, 6 L.Ed.2d at 1058.

As Justice Frankfurter makes clear, the standard of review is *not* the same with respect to each stage. As to the first stage, the historical fact finding, the clearly erroneous rule (or the likes thereof) does indeed apply:

> In a case coming here from the highest court of a State in which review may be had, the first of these phases is definitely determined, normally, by that court. Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

> This means that all testimonial conflict is settled by the judgment of the state courts. Where they have made explicit findings of fact, those findings conclude us and form the basis of our review—with the one caveat, necessarily, that we are not to be bound by findings wholly lacking support in evidence.

*Id.,* 81 S.Ct. at 1879, 6 L.Ed.2d at 1058. See also *Lisenba v. California, supra,* 314 U.S. at 238, 62 S.Ct. at 290, 86 L.Ed. at 181; *Gallegos v. Nebraska, supra,* 342 U.S. at 61, 72 S.Ct. at 145, 96 L.Ed. at 92.

---

**8.** There was no majority opinion in *Culombe.* Rather, there were five separate opinions: one by Frankfurter, J., (joined by Stewart, J.), one by Warren, C. J., one by Douglas, J., (joined by Black, J.), one by Brennan, J., (joined by Warren, C. J., and Black, J.), and a dissent by Harlan, J., (joined by Clark, J., and Whittaker, J.). Despite this confusion, however, the standard of review articulated by Justice Frankfurter was approved by a majority of the Court, since Justice Harlan's dissent (for three Justices) expressed agreement with Justice Frankfurter's statement (for himself and Justice Stewart) of "the factors which should guide federal judicial review of state action in this field." 367 U.S. at 642, 81 S.Ct. at 1900, 6 L.Ed.2d at 1080.

Mr. Justice Frankfurter's mini-treatise in *Culombe* was described by one noted authority as "the most ambitious attempt to bring order, coherence and clarity to the 'involuntary' or 'coerced' confession field. . . ." Kamisar, A Dissent from the Miranda Dissents: Some Comments on the "New" Fifth Amendment and the Old "Voluntariness" Test, 65 Mich.L. Rev. 59, 98 (1966). Another writer described the opinion as "the only detailed and thoughtful discussion of [the standard of review] appearing in any coerced confession case." Note, Supreme Court Review of State Findings of Fact in Fourteenth Amendment Cases, 14 Stan. L.Rev. 328, 349 n.107 (1962).

In addition, where there are no explicit findings of fact and the proper legal standards have been applied, all conflicts in the testimony must be resolved against the defendant and the reviewing Court may consider only the *undisputed* facts:

Where there are no explicit findings, or in the case of lacunae among the findings, the rejection of a federal constitutional claim by state criminal courts applying proper constitutional standards resolves all conflicts in testimony bearing on that claim against the criminal defendant. In such instances, we consider only the uncontested portions of the record: the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.

367 U.S. at 603–04, 81 S.Ct. at 1879–80, 6 L.Ed.2d at 1058. See also *Thomas v. Arizona, supra*, 356 U.S. at 402–03, 78 S.Ct. at 892, 2 L.Ed.2d at 871–72; *Ashcraft v. Tennessee, supra*, 322 U.S. at 152, 153, 64 S.Ct. at 925, 926, 88 L.Ed. at 1198, 1199. See generally Note, Supreme Court Review of State Findings of Fact in Fourteenth Amendment Cases, 14 Stan.L.Rev. 328, 339–41 (1962) [hereafter referred to as Stanford Note].

With respect to the second and third phases of the examination, the reviewing Court is not constrained by the "clearly erroneous" standard:

The second and third phases of the inquiry—determination of how the accused reacted to the external facts, and of the legal significance of how he reacted—although distinct as a matter of abstract analysis, become in practical operation inextricably interwoven. This is so, in part, because the concepts by which language expresses an otherwise unrepresentable mental reality are themselves generalizations importing preconceptions about the reality to be expressed. It is so, also, because the apprehension of mental states is almost invariably a matter of induction, more or less imprecise, and the margin of error which is thus introduced

into the finding of "fact" must be accounted for in the formulation and application of the "rule" designed to cope with such classes of facts. The

*[367 U.S. 605]

* notion of "voluntariness" is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes. Since the characterization is the very issue "to review which this Court sits," [quoting authority], the matter of description, too, is necessarily open here.

No more restricted scope of review would suffice adequately to protect federal constitutional rights. For the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel.

367 U.S. at 604–05, 81 S.Ct. at 1880, 6 L.Ed.2d at 1059.

It is absolutely critical to emphasize, however—and the panel and Judge Garza overlook this point—that even with respect to the second and third phases of the inquiry, the role of the reviewing Court is not entirely unlimited. Even with respect to these phases, inferences drawn by the lower Courts may be entitled to some weight:

Great weight, of course, is to be accorded to the inferences which are drawn by the state courts. In a dubious case, it is appropriate, with due regard to federal-state relations, that the state court's determination should control.

*Id.* at 605, 81 S.Ct. at 1880, 6 L.Ed.2d at 1059. See also *Haynes v. Washington, supra*, 373 U.S. at 515, 83 S.Ct. at 1344, 10 L.Ed.2d at 522, which states: "[T]he determination of the trial judge or the jury . . . may be entitled to some weight *even with respect to the ultimate conclusion on the*

*crucial issue of voluntariness."* (Emphasis added.) [9]

As articulated in the case law, the Fifth Circuit's "clearly erroneous" review standard may not be that much different from the "independent review" standard set forth by the Supreme Court. First, as to "historical facts," the Supreme Court itself indicates that a clearly erroneous type standard should apply. Thus the phrase "independent review of the record" does not mean that the appellate Court should act as a fact finding body and we strongly disagree with anything in the panel opinion which could be read as suggesting otherwise. Moreover, because this Circuit does not apply the clearly erroneous rule with respect to inferences drawn from documents, transcripts, or undisputed facts, the Supreme Court's requirement that an appellate Court make an independent determination based on the *undisputed* facts [10] will be met even under a clearly erroneous review standard.[11]

However, there are differences between the two tests. Under the clearly erroneous standard, there is a danger that the appellate Court may give too much deference to the ultimate conclusions of voluntariness by the Courts below. The various cases applying the clearly erroneous rule give the District Court's conclusion on the ultimate question of voluntariness a heavy presumption of correctness. The Supreme Court's standard cautions against giving strong weight to the ultimate finding of voluntariness (as opposed to subsidiary findings) except in close cases, where it is entirely appropriate to give deference to the lower Courts even on the ultimate question of voluntariness.

## C.

Because all joining in this opinion believe that Jurek's confessions are admissible even under the Supreme Court's broader standard of review, we apply that standard in our analysis below without the necessity of determining precisely whether "clearly erroneous" or "independent review" is to be the standard. This case is complicated somewhat because we are faced with findings of voluntariness by a jury, a State

**9.** Mr. Justice Frankfurter's opinion in *Culombe* suggests—at least implicitly—that the issue of voluntariness is one of mixed law and fact. See also the Supreme Court cases cited pp. 959–960. Thus, the Supreme Court's view of the nature of the voluntariness issue contrasts with the common law approach, which viewed the voluntariness of a confession as purely a question of fact. See Stanford Note, *supra*, at 338.

**10.** While some Supreme Court cases suggest that the reviewing Court must scrutinize the "entire" record, see most recently, *Mincey v. Arizona, supra*, 437 U.S. at 398, 98 S.Ct. at 2417, 57 L.Ed.2d at 304 ("this Court is under a duty to make an independent evaluation of the record"), other cases have made clear that the independent evaluation is on the basis of the *undisputed* facts. See, e. g., *Culombe v. Connecticut, supra* (quoted *supra* p. 961); *Thomas v. Arizona, supra*, 356 U.S. at 393, 78 S.Ct. at 887, 2 L.Ed.2d at 866; *Malinski v. New York*, 324 U.S. 401, 404, 65 S.Ct. 781, 783, 89 L.Ed. 1029, 1032 (1945); *Lisenba v. California, supra*, 314 U.S. at 238, 62 S.Ct. at 290, 86 L.Ed. at 181 (although stating that the appellate Court must make an independent examination of the record, the Court makes clear that it must accept factual determinations of the triers of fact regarding disputed facts unless they are wholly without support in the record). See also Stanford Note, *supra*, at 343 (pointing out that in

*Ashcraft v. Tennessee, supra*, and *Chambers v. Florida, supra*, the "independent examination" was limited to the undisputed facts). *Ashcraft* is cited by *Davis v. North Carolina, supra*, for the proposition that the Court must make an independent review of the record. 384 U.S. at 742, 86 S.Ct. at 1764, 16 L.Ed.2d at 898. And the Court in *Davis* goes on to analyze the record "wholly apart from the disputed facts." *Id.*, 86 S.Ct. at 1765, 16 L.Ed.2d at 898. Similarly, *Davis* is relied on by the majority in *Mincey v. Arizona, supra*, 437 U.S. at 398, 98 S.Ct. at 2417, 57 L.Ed.2d at 304. There is thus no reason to believe that in *Mincey* or in any other case, the Supreme Court has abolished the rule that the focus is on the *undisputed* facts.

**11.** Of course, since the question of whether to apply the clearly erroneous rule to inferences drawn from transcripts, documents or undisputed facts was not completely settled by the entire Court until *Nash v. Estelle, supra*, see p. 958, the Fifth Circuit cases applying the clearly erroneous rule to voluntariness of confession determinations may have incorrectly applied the clearly erroneous rule to inferences drawn by the lower Courts from transcripts, documents, or undisputed facts.

Trial Court, a State Court of Appeals, and a Federal District Court. Where the District Court made historical findings of fact based on testimony adduced at the habeas hearing, we are bound to accept these findings unless clearly erroneous. Where the District Court did not make subsidiary findings of fact, it is appropriate for us to look to the state Courts for guidance, and to look ourselves at the record, to discern the undisputed facts. And it may also be appropriate in certain cases to give weight to the inferences drawn by the various state Courts, the jury, and the District Court even with respect to the ultimate issue of voluntariness.

## II. Facts Surrounding The Confessions

The panel opinion [hereafter sometimes referred to as Panel Op.] and Judge Garza's opinion [hereafter referred to as Judge Garza's Op.] discuss the formulae for determining whether a confession is voluntary. See Judge Garza's Op., p. 937 n.6; Panel Op., 593 F.2d at 676. In a nutshell:

If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because [it is] coerced.

*Townsend v. Sain, supra,* 372 U.S. at 307, 83 S.Ct. at 754, 9 L.Ed.2d at 782 (quoting authority). As Judge Garza correctly points out, in a habeas proceeding the burden of establishing facts which demonstrate involuntariness is on the petitioner. See, e. g., *Lokos v. Capps,* 528 F.2d 576, 578 & n.3 (5th Cir. 1976). *Cf. LaVallee v. Delle Rose,* 410 U.S. 690, 695, 93 S.Ct. 1203, 1205, 35 L.Ed.2d 637, 641 (1973).

We believe that both of Jurek's confessions are voluntary. However, because the en banc Court holds that the first is voluntary but the second is not, we consider each confession separately. Since several factors were, in the view of the panel, indicative of involuntariness with respect to both confessions, we first consider those factors before focusing on the precise circumstances of each of the two confessions. Our factual discussion is rather detailed, but since this case depends so heavily on the precise facts, we believe that such a detailed discussion is essential.

### A. General Considerations: Circumstances Common To Both Confessions

The panel opinion emphasized two considerations common to both confessions which suggest involuntariness: (1) the pre-confession conduct of the police and prosecuting attorneys, and (2) Jurek's limited mental capacity. We discuss each consideration separately.

### i. Pre-Confession Police/Prosecutor Conduct

The panel opinion suggested that the two written confessions were suspect because they "were the fruits of an extraordinary series of actions by the police and prosecutors." 593 F.2d at 677. Specifically, the panel pointed out that Jurek was arrested, taken from his home without shirt or shoes, kept from his family, was not given an attorney for 42 hours, and "was moved from Cuero to Austin and then back to Cuero, then to Victoria and back to Cuero." *Id.* at 678. The panel then cited a Supreme Court case, *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), for the proposition that "compelled travel during interrogation is a factor suggesting involuntariness." 593 F.2d at 678. The panel also pointed out that Jurek was arrested without a warrant. *Id.* Earlier in the opinion the panel had indicated that Jurek was logged into jail at 2:30 a. m. on August 17 and was questioned *"for at least the next ten hours* [although] there were some respites, during which Jurek apparently was allowed to sleep." *Id. at 674 (emphasis added).*

The statements of the panel are in marked contrast to the findings and inferences by the Courts below. The Federal District Court explicitly found:

There is no evidence that Jurek's incarceration in the Victoria Jail was an effort to or resulted in lack of communication with his family. Nor is there any evidence that Jurek's confessions were a re-

sult of or were tained [sic] by a delay in taking Jurek before a magistrate. The circumstances of Petitioner's arrest after midnight and the fact that he was barefoot until he got to the jail do not amount to overbearing of will.

R. 445–46. Similarly, the Texas Court of Criminal Appeals stated:

> [T]he record reflects that the authorities had ample evidence to detain, question and arrest appellant. On the afternoon of the homicide, witnesses saw appellant, in his patchwork and haphazardly painted pickup, talking with the deceased in the Cuero City Park, where she had gone swimming. Shortly thereafter witnesses saw her riding in the back of this unusually colored pickup, screaming for help, as it sped through town. A relative soon reported her missing, and the search for her ensued. That evening, one of the witnesses who had seen this particular pickup at the park, identified it as the truck parked at appellant's residence. Appellant was therefore a logical person to question about the missing child's whereabouts. . . . There is no showing that the detention contributed to the making of appellant's two confessions. . . .
>
> Appellant was arrested at 1:15 a. m. on August 17, approximately six hours after the child's disappearance. At police headquarters, the two arresting officers read appellant his *Miranda* warnings, and questioned him for approximately 45 minutes. He denied any knowledge concerning the child's whereabouts. At 2:30 a. m., he was placed in a jail cell, which contained a bed, and was left alone until the next morning, when the county attorney, who also read appellant his *Miranda* warnings, questioned him for approximately 15 minutes. He continued to deny any knowledge about the child's whereabouts. Two or three other officers spoke with him briefly during the morning.
>
> Later in the day, two officers took appellant to Austin for a polygraph test. During the examination, he admitted murdering the girl. Her body was later recovered on the basis of information supplied by appellant at this time. The officers arrived back at Cuero with appellant at approximately 9:30 a. m. [should read p. m.]. He was immediately taken before Magistrate Albert Ley, who read appellant his rights from a magistrate's certificate. Approximately four hours later, after being questioned by the district attorney and the county attorney, appellant gave his first confession. The confession stated that he killed the child because she made derogatory comments about his family. He was taken to the County Jail at Victoria at about 1:15 a. m. He was returned to Cuero at 2:00 p. m. and gave his second confession at 7:30 that evening after again speaking with the district attorney and the county attorney and several others. In the confession he stated that he had not told the complete truth in his earlier statement and that he killed the girl because she refused his sexual advances.
>
> The record reflects that appellant was repeatedly warned of his constitutional rights under *Miranda*. There is no evidence in the record that appellant was deprived of food or sleep, or that he was not in complete control of his faculties when he gave the confessions. He was left alone in his cells between interrogations and was offered food and beverages at various times during this two day period. There is evidence that he was alert enough to make minor corrections in the confessions before signing them.

*Jurek v. State*, 522 S.W.2d 934, 942–43 (Tex. Cr.App.1975) (footnote omitted).

Most of the facts discussed by the Federal District Court and the Texas Court of Criminal Appeals are undisputed. Moreover, we agree with the inferences drawn by these Courts from the undisputed facts with respect to the ultimate issue of voluntariness. Indeed, after making our own examination of the record, we are puzzled because of the large quantity of evidence contradicting the factual assertions made by the panel and the lack of *any* evidence in the record to support some of the panel's

statements, despite the panel's claim to be relying only on undisputed facts. 593 F.2d at 674 n.2.

For example, the panel's suggestion that Jurek was questioned throughout the night after his arrest is not only unsupported by but is flatly contradicted by the record. See, e. g., Tr., Vol. I, 111–12; Tr., Vol. VI, 1333 (testimony of County Attorney Post); Tr., Vol. VIII, 1668–69 (testimony of Cuero Police Chief Wright).[12] Jurek's own attorney conceded in closing argument that after being put in jail, Jurek was left alone the rest of the night. Tr., Vol. VIII, 1815. And those who saw Jurek the next day testified that he appeared rested. See, e. g., Tr., Vol. VI, 1336 (testimony of County Attorney Post).

It is true that Jurek was taken to Austin for a polygraph test and was then moved to the Victoria Jail. However, the panel opinion is grossly misleading because it fails to consider adequately—if at all—the undisputed facts surrounding these events. To begin with, it is undisputed that the polygraph test was given *at Jurek's own request.* Tr., Vol. VI, 1311 (testimony of County Attorney Post). Jurek has at no time brought forth any evidence to rebut the undisputed evidence that he requested the polygraph test. Moreover, it is undisputed that Jurek was taken before a magistrate *as soon as he returned from Austin* (about 9:30 p. m.). Tr., Vol. VI, 1315–16 (testimony of County Attorney Post). And Jurek was offered meals and cigarettes be-

fore, during, and after his trip to Austin. Tr., Vol. VI, 1339–41 (testimony of County Attorney Post).[13] We find it incredible that Jurek can claim in this Court that the conduct of the police was coercive when the police were merely abiding by Jurek's own wishes.

Regarding Jurek's transfer to the Victoria Jail, the undisputed evidence establishes that this move was *for Jurek's own safety.* As the record makes clear, the victim's father was a county patrolman in Cuero and had access to the DeWitt County Jail in Cuero. All of the witnesses who testified on the matter agreed that Jurek's safety was the sole consideration in the decision that he stay at the Victoria Jail, not at the county jail in Cuero. E. g., Tr., Vol. I, 136, 141 (testimony of Sheriff Dietze); Cheatham Dep., 35–37 (testimony of District Attorney Cheatham). Indeed, there was evidence that Jurek himself expressed a desire to stay at the Victoria Jail. Tr., Vol. VI, 1324 (testimony of County Attorney Post); Tr., Vol. VI, 1440–41 (testimony of Robert Pickens). There is no evidence that Jurek suffered from this good faith transfer. Indeed, Victoria is less than 30 miles from Cuero.

It is also undisputed that on numerous occasions before the two confessions were given, Jurek was given his *Miranda* warnings.[14] For example, Judge Albert Ley, the Magistrate before whom Jurek appeared on the evening of the 17th, testified at length that he gave Jurek his warnings.[15]

---

12. The trial transcript and pretrial suppression transcript are referred to throughout this opinion as "Tr." with the volume number as well as page number also given. The deposition of District Attorney Wiley Cheatham, which was taken prior to the Federal habeas hearing, is referred to as "Cheatham Dep." The habeas corpus transcript is referred to as "R."

13. Nor is there any evidence that the trip to Austin had any adverse effect on Jurek. Magistrate Ley testified that at the time Jurek appeared before him, Jurek did not look at all fatigued. Tr., Vol. VI, 1385. Moreover, Magistrate Ley testified that Jurek had no difficulty carrying on a conversation with him. Tr., Vol. I, 86–87.

14. The giving of warnings immediately prior to the eliciting of each of the two confessions is discussed in parts IIB and IIC below.

15. Judge Ley told Jurek, among other things, reading from his Magistrate's Certificate, that:

1. [Jurek] was entitled to the services of a lawyer of his own choice to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the State.

2. If he could not afford to hire a lawyer, he could ask for and receive the services of a lawyer appointed to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the State, without any cost or charge to him.

Like the District Court, we conclude that little, if any, significance can be attached to the fact that Jurek was not wearing shoes or a shirt at the time of arrest.[16] Both of Jurek's parents (who testified that Jurek was arrested without shirt and shoes) conceded that the police returned to the Jureks' residence the next day and picked up shoes and a shirt. Tr., Vol. VIII, 1734–35 (testimony of Mrs. Jurek); Tr., Vol. VIII, 1752 (testimony of Mr. Jurek). And Deputy Sheriff McMahan recalls that during the next day, Jurek was wearing shoes. Tr., Vol. VII, 1641. At most, Jurek went for one night without shoes and shirt, hardly a basis, either alone or in conjunction with the other factors, for declaring his confessions involuntarily.[17]

The facts discussed above do not in any way suggest an attempt to "break Jurek down." Panel Op., 593 F.2d at 678. Nor can we say that "their effect could only have been to disorient Jurek, to weaken his resistance and heighten his suggestibility." *Id.* There are present here none of the egregious facts upon which Supreme Court holdings of involuntariness have been based.[18] The interval between arrest and the confessions was devoid of any coercive or unfair tactics by the police and prosecution. In the words of the Supreme Court: "No threats were made, no promises offered, [and] no force used . . . ." *Thomas v. Arizona, supra,* 356 U.S. at 401, 78 S.Ct. at 891, 2 L.Ed.2d at 871. "[W]e find ample support in this record for a finding that the officers did not intend to take advantage of petitioner and that nothing they did had the effect of overbearing [petitioner's] will." *Ashdown v. Utah,* 357 U.S. 426, 431, 78 S.Ct. 1354, 1357, 2 L.Ed.2d 1443, 1447 (1958).

### ii. Jurek's Mental Capacity

The panel opinion, in holding both of Jurek's written confessions involuntary, re-

---

3. He had the right to remain silent, not to answer any questions or make any statements at all, nor incriminate himself in any manner.

4. Anything he said could and would be used against him in a court or courts of law for the offense or offenses of which he might be accused.

5. He could refuse to answer any questions at any time, and he could stop answering questions at any time.

Tr., Vol. I, 84. See also Tr., Vol. VI, 1379, 1389.

**16.** In fact, it is far from clear that Jurek did not have on shirt and shoes at the time of arrest. While both of Jurek's parents testified to this, Tr., Vol. VIII, 1735 (testimony of Mrs. Jurek), Tr., Vol. VIII, 1749 (testimony of Mr. Jurek), Officer Boldt, who brought Jurek to the jail on the early morning of arrest, testified:

Q [By the Defense Attorney] . . . Now, do you remember what clothes Jerry had on when you picked him up and brought him down to the jail?

A He had on a pair of maroon or purplish-looking jeans and a pair of white shoes, white loafers, and a khaki-colored shirt.

Q Well, now, are you sure about the fact that he had the shoes and shirt at that particular time?

A As far as I can remember, yes, sir, he did.

Tr., Vol. VIII, 1759. And neither Officer Boldt nor Deputy Sheriff McMahan had anything to do with or appeared to know about getting a shirt and shoes for Jurek for his trip to Austin. Tr., Vol. VII, 1641 (testimony of Deputy Sheriff

McMahan); Tr., Vol. VIII, 1759 (testimony of Officer Boldt). Nor can we locate any testimony by anyone (other than Mr. and Mrs. Jurek) that someone picked up shoes and shirt for Jurek later in the day, even though it is undisputed that Jurek did have shirt and shoes later that day. In spite of the fact that the evidence is in dispute, however, we give Jurek the benefit of the doubt and assume for purposes of this opinion that on the early morning of his arrest Jurek did not have on shirt and shoes.

**17.** Nor does any significance attach to the fact that Jurek was arrested without a warrant. As the Texas Court of Criminal Appeals pointed out, see p. 964 *supra* (*quoting Jurek v. State, supra* ) there was clearly sufficient basis for arresting Jurek without a warrant. Under such circumstances, we cannot understand the panel's apparent assumption that the presence of a warrant would somehow have made the confessions less coercive.

**18.** Without undertaking to summarize here the many Supreme Court cases involving the voluntariness of confessions, it suffices that after examining them, we have concluded that the facts in the Supreme Court cases holding confessions involuntary are egregious, while the facts here are not egregious in the least. For an excellent discussion of the Supreme Court cases up to 1966, see generally Note, Developments in the Law: Confessions, 79 Harv.L.Rev. 938, 954–81 (1966).

lied heavily on Jurek's limited mental capacity. The evidence is undisputed that Jurek is of somewhat low intelligence. The various doctors who testified agreed that Jurek's overall IQ is about 80. See, e. g., Tr., Vol. VIII, 1709 (testimony of Dr. Kenneth Owens); R., 82 (testimony of Dr. Russell Adams). The District Court found that Jurek "is an individual of below-average intelligence, mildly retarded, with possible organic brain damage." And the evidence established that Jurek had only a seventh grade writing ability. Tr., Vol. VIII, 1678 (testimony of Dr. William McKinney). However, the *effect* of Jurek's "dull normal" intelligence on his ability to give a voluntary confession is not established by the evidence and clearly the panel's statement, "[T]here is a serious danger both that Jurek did not want to confess and that his susceptibility to the police officers' influence made him confess to things he did not do," 593 F.2d at 677, is flagrant appellate fact finding at its worst. The District Court found that the psychiatric testimony presented to it was "inconclusive" and "not convincing." R., 434. After hearing the testimony and reviewing the record, the District Court concluded: "Considering Jurek's intelligence, either alone or in conjunction with the other factors, does not indicate an involuntary confession." R., 445.

There is some support in the record for the panel's position, although the evidence is at best inconclusive. Dr. Lawrence Schoenfeld, a witness at the Federal habeas hearing, testified that Jurek might be coerced into confessing to escape from a tension-producing situation. But Dr. Schoenfeld emphasized that this was not positively the case. See also Tr., Vol. VIII, 1714 (testimony of Dr. Kenneth Owens). Other medical experts were even less conclusive. For example, Dr. William McKinney testified that when he interviewed Jurek, Jurek did not feel coerced into giving answers he did not want to give:

> . . . I did not feel that—that, you know that he was just going—just answering the questions just to give me an answer, irregardless. I think this is what

you [Defense Attorney] are implying, that he would be willing to say anything to get over the question. I felt that he was giving me what he—what he felt, although, at times, his statements were contradictory.

Tr., Vol. VIII, 1682. Dr. McKinney conceded, however, that his interviews with Jurek may not have been as stress-producing as police-house interrogation. Tr., Vol. VIII, 1684. Dr. McKinney also conceded that it was "possible" that Jurek could be swayed into signing a confession against his interests. Tr., Vol. VIII, 1700.

Moreover, although there was evidence that Jurek was somewhat susceptible to pressure in a stress-producing environment, the evidence also established that Jurek was capable of understanding the contents of the confessions. For example, Dr. Owens testified that if the two written confessions were read to Jurek he could understand them. Tr., Vol. VIII, 1718. Similarly, Dr. McKinney testified that Jurek could understand the two confessions:

> I believe that he does have adequate intellectual capacity to read and understand [the confessions]. . . . There would only be a few words that I would question whether he would, perhaps, comprehend the meaning of [them].

Tr., Vol. VIII, 1678.

The panel also stated, based on the psychological testimony, that Jurek "is less likely to be able to understand his right to remain silent. He may also be unable to insist effectively that that right be observed." 593 F.2d at 677. The evidence is again very inconclusive, however. While Dr. Schoenfeld testified at the Federal habeas hearing that Jurek might have difficulty understanding the *Miranda* warnings, R., 37, Dr. Russell Adams disagreed with the tenor of that testimony:

> There is one particular area that I would take a slightly different view, although I don't know that it certainly is a divergent view with Dr. Schoenfeld's report, and that has to do with whether or not Mr. Jurek understood the *Miranda* warning.

It is my contention that he probably did understand it if it were presented—if it were explained to him, I think he would have ability to understand it.

R., 75. Later Dr. Adams testified:

I felt the patient was able to understand information presented him orally in a—no, wait. I felt that the patient's ability to understand information presented him orally and in writing was poor, but it was generally in line with his intellectual ability and in my opinion he did have the ability to understand in general terms the *Miranda* warning.

R., 87. Dr. Adams conceded, however, that the warnings would have to be clearly explained to Jurek, see R., 76, and that Jurek's ability to understand the *Miranda* warnings was not as high as that of most other people. See R., 88–89.

To summarize, while it is undisputed that Jurek's intelligence was somewhat below normal, the exact impact of this on his susceptibility to coercion is far from undisputed. Moreover, it is anything but clear that Jurek could not understand the confessions or *Miranda* warnings. As stated above, the District Court concluded that Jurek's somewhat limited mental capacity did not, either alone or in conjunction with other factors, render his confessions involuntary. And we must remember that the District Court, having heard testimony by three medical experts, found that testimony unpersuasive and did not find anything persuasive in the record, either. Unlike this Court, the District Court had the opportunity to judge the credibility of these medical witnesses. In our view, because the impact of Jurek's limited mental capacity is so unclear, we think this is one of those occasions

when the inferences drawn by the District Court are entitled to significant weight even with respect to the ultimate determination of voluntariness. See *Culombe v. Connecticut, supra,* 367 U.S. at 605, 81 S.Ct. at 1880, 6 L.Ed.2d at 1059; *Haynes v. Washington, supra,* 373 U.S. at 515, 83 S.Ct. at 1344, 10 L.Ed.2d at 522. The District Court's conclusion is buttressed by the conclusions of the State Trial Court, jury, and Appellate Court, all of which found, after considering the testimony presented at trial regarding Jurek's limited mentality, that Jurek's confessions were voluntary. Thus, after giving appropriate weight to the inferences drawn below, and after carefully reviewing the record, we conclude that Jurek's limited mental capacity, considered alone, or in conjunction with the other factors discussed in this opinion, did not make Jurek's written confessions involuntary.[19]

### B. The First Confession

We concur with Judge Garza's analysis and conclusion with respect to the first confession. However, we think it useful to emphasize some additional evidence supporting the conclusion that the first confession was voluntary.

At the outset, it is important to emphasize that the undisputed evidence reveals that Jurek was given *Miranda* warnings immediately prior to making the first written confession and indicated at that time that he did not want an attorney:

Q [By the District Attorney] . . . And I will ask you whether or not you gave the defendant his warnings?

A [County Attorney Post] Yes, I did. And, in fact, I customarily read and, in this instance, I did, also. I read

---

**19.** The panel cited three Supreme Court cases for the proposition that "a confession made by [a person with limited intelligence] is more likely to be involuntary." In each of these cases, *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); *Culombe v. Connecticut, supra; Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), the defendant was in worse mental condition than Jurek, and the other surrounding circumstances were egregious, unlike those involved in this case. In *Sims,* the defendant was illiterate and had only

a third grade education. Moreover, there was evidence that he was subjected to physical violence. In *Culombe,* the defendant was a moron who had previously been in mental institutions and was wholly illiterate. In *Fikes,* the defendant was a schizophrenic and was highly suggestible and left school in the third grade at the age of 16. Moreover, he was interrogated frequently for five days before giving the first confession and was interrogated at length after that before giving a written confession.

directly from the statement form, itself.

Q The statement, itself. All right. Did you read the complete printed warning that appears on State's Exhibit No. 2—

A Yes, sir.

Q —to this defendant, prior to his making any statement?

A Yes, sir, I did.

Q All right, sir. And, in other words, did you inform him that he was facing a murder charge of little Wendy Adams?

A Yes, sir, I did.

Q And that he had a right to retain counsel, and if he could not obtain counsel that one would be appointed for him?

A Yes, sir, I did.

Q Did he make any requests for counsel there at that time?

A No, sir. In fact, he stated that he did not want an attorney at that time.

Tr., Vol. I, 103–04 (testimony of County Attorney Post).

In addition, we agree with the District Court that Jurek made no clear request for an attorney earlier—when he was given *Miranda* warnings by Judge Ley.[20] And we fully agree with Judge Garza's analysis of the waiver question and the applicability of *Nash v. Estelle, supra.*

As Judge Garza points out, Garza Op., p. 934, the first confession was given with both County Attorney Post and District Attorney Cheatham present. It is undisputed that Cheatham attempted to take down the confession in Jurek's own words. See

---

20. Admittedly, Judge Ley's testimony is somewhat ambiguous, but we believe that, read in its entirety, the testimony reveals that no clear request for counsel was made. While this Court does not consider whether Jurek's *Miranda* rights were violated, we agree with Judge Garza, Garza Op., p. 939, and the panel, 593 F.2d at 679, that a possible violation of *Miranda* would be a factor suggesting that both confessions may be involuntary. Here, however, even assuming that Jurek's comments to Judge Ley could somehow be interpreted as a request for counsel, no *Miranda* violation occurred. In *Blasingame v. Estelle,* 604 F.2d 893 (5th Cir. 1979), this Court considered whether a clear request for counsel to a magistrate at arraignment prevented subsequent stationhouse interrogation. As is the case here, the defendant in *Blasingame* was again informed of his rights prior to interrogation and indicated that he did not want an attorney. The Court held that there was no *Miranda* violation, reasoning:

. . . [W]e hold that the request for an attorney at arraignment does not prevent subsequent station-house interrogation where the request at arraignment is not made in such a way as to effectively exercise the right to preclude any subsequent interrogation.

In this case the circumstances surrounding Blasingame's counsel request show it to have been unrelated to the Fifth Amendment-based right to confer with or have counsel present before answering *any* questions. There is no indication that Blasingame intended to convey the idea that he would not discuss the crime until counsel was appointed and present. At arraignment before the magistrate he was not subjected to any questioning beyond the offer of an opportunity to make a statement if he so desired. The police detective who took Blasingame to be arraigned testified at trial that after the magistrate informed Blasingame of his right to appointment of a lawyer if he could not afford one, Blasingame said, "Yes, I would like an attorney. I can't afford one." The magistrate then went on and read the other four rights listed in the warning. The police detective testified, "When he was given this information . . . he didn't say, 'I don't want to talk to anybody. I want my attorney right now present,' or anything like that."

*Blasingame's case is thus markedly different from [United States v. Priest, 409 F.2d 491 (5th Cir. 1969)], and its progeny in which requests for counsel were made at the time of custodial interrogation and in obvious connection with a desire to consult an attorney before answering questions.* See *United States v. Massey,* 550 F.2d 300 (5th Cir. 1977).

604 F.2d at 896 (emphasis added). We think that *Blasingame* completely undercuts a major assumption of the panel opinion's analysis of the voluntariness issue, namely, that "if Jurek's remarks to the Magistrate constituted a request for counsel, both of Jurek's confessions were automatically inadmissible under *Miranda*, irrespective of the other circumstances." 593 F.2d at 679. We think *Blasingame* also applies *by analogy* to demonstrate that the Magistrate's failure to appoint counsel and the subsequent interrogation did not, alone or in conjunction with the other factors, render Jurek's confessions involuntary.

Cheatham Dep., 61, *quoted in* Garza Op., p. 934 n. 4.

After the confession was typed, the State took enormous care to ensure that Jurek fully understood exactly what he was signing. The statement was read by and to Jurek in the presence of two witnesses selected from the community. As County Attorney Post testified:

Q [By the District Attorney] . . . And let me ask you this: Was he given an opportunity to read it or have it read to him?

A Yes, sir. He was given both opportunities. And, in fact, he declined, I believe—well, in this instance, I believe he actually read the statement, himself, and then it was read.

Q Out loud?

A It was read out loud by him?

Q In the presence of the witnesses.

A Right.

Tr., Vol. I, 106. And according to Post, Jurek made corrections and initialed changes while reading through the confession:

Q [By the District Attorney] . . . And was he asked as he went along— in other words, was it checked every sentence or so to see if this was correct?

A Yes, sir.

Q I believe there is one correction of the name there at the top, is this correct or not, sir?

A Yes, it is.

Q And who made that? Who requested that correction to be made, if you recall?

A The defendant, himself, did.

Tr., Vol. I, 106–07 (testimony of County Attorney Post).

One of the witnesses to the signing of the first confession was Robert Hesse, a probation officer. As his testimony reveals, Hesse was very careful to make sure that Jurek's confession was voluntary:

Q [By the District Attorney] Was he asked there if he freely and voluntarily made that statement?

A Yes, he did. And I was very cautious before I signed it, to make sure. And I asked Jerry, myself, in my own words, "Are you sure this is what you want to sign, and this is your statement, as you want it?"

Q Uh-huh.

A "And are you telling me that all the things you read up here are true, and you have not been forced; you are doing this of your own free will and accord?"

And he assured me that he was, before I signed that.

Q In other words, you did that in addition to what Mr. Post—

A Yes, sir.

Q —and I had already done, each one of us, is that correct, sir?

A Yes, sir. Because I was pretty sure it would come to this point right here, and I wanted to make sure before I signed it.

Q In other words, if I understand correctly, in addition to all the warnings and explanations that Mr. Post and I made in your presence, you, yourself—

A That's correct.

Q —did this with the defendant, and assured yourself that he was signing it freely and voluntarily, and of his own accord, is this correct?

A Yes, sir.

\* \* \* \* \* \*

[Hesse testimony continued] . . . After it was over with, I made sure this was his statement and this is the way he wanted it. And I told him, "You know you do not have to sign this, but this is what you freely want to do?"

Again, I made the point of making sure. "You are not coerced or nothing's happened, no threats have been made; this is your statement?"

And I felt sure the time that I signed it that that was his statement.

Tr., Vol. VI, 1402–03, 1405. In addition, Hesse confirmed that Jurek initialed typographical errors in the confession:

Q [By the District Attorney] . . . [D]id you see the defendant place his initials on the—

A Yes, sir.

Q —typographical errors?

A Yes, sir.

Q All right, sir.

A The errors had not been corrected when I was there. And while I was there, the errors were corrected and with Jerry's permission, he initialed each—each correction in the statement.

Tr., Vol. VI, 1401.

For the reasons stated in Judge Garza's opinion, supplemented by the reasons and facts stated by us, we conclude, after carefully examining the record, that Jurek's first confession was voluntary and hence, was properly admitted into evidence.

## C. The Second Confession

Judge Garza's opinion, after holding that the first confession was properly admitted into evidence, declared that "[t]he circumstances are *vastly different* with regard to the second confession." Garza Op., p. 940 (emphasis added). We strongly disagree with Judge Garza's conclusion that the second confession was involuntary.

We first examine the factors relied upon by Judge Garza in distinguishing between the two confessions, concluding that most of them are not supported by the record. We then discuss other factors not alluded to by Judge Garza or the panel which reinforce the findings below that the second confession was voluntary.

### i. Distinctions Between The Confessions Emphasized By Judge Garza

#### a. Language And Grammatical Differences Between The Two Confessions

A distinction between the two confessions strongly emphasized by Judge Garza is based on the wording of the confessions themselves. As the opinion states:

The correct grammar and composition of [the second confession] [is] . . . vastly different from that of the first. *It would be impossible to conclude that the same person gave each confession verbatim.*

Garza Op., p. 935 (emphasis added). For convenience, we reproduce both the first [21] and second [22] confessions in their entirety.

---

**21.** The first confession reads in its entirety: I had known Wendy Adams about a month and a half, and I think that she is 10 years old. During the afternoon of August 16, 1973 I picked up Richard Broz and Ricky Phillips and we rode around and drank a carton of beer; we drove through the park and was going to pick up Shirley Kay Range, but I didn't see her; then I dropped Richard and Ricky off at Laake's pool hall and drove back up to the park. I seen Wendy Adams at the swimming pool and asked her if she wanted to go riding around and she said "Yea"; she crawled in the back of the pick up truck and I drove out to Hell's Gate Bridge. From the park I drove past the skating rink, turned right at the high school and came down the hill by the cemetary and went to the Yoakum Highway on what I think was Reuss Blvd. As I came on the Yoakum Highway, a big truck almost hit me; from there I drove out past where the old drive-in picture show used to be and turned off on a small road to the left and from there on out to Hell's Gate Bridge; I turned off the pavement to the right and drove down close to the river. We sat on the side of the truck and talked. Wendy was still dressed in her bathing suit that she'd had

on when we left the park. Wendy told me that I shouldn't be drinking, and that I was just like my brother who drinks a lot; and she also told me that my nieces didn't have a good father because he didn't come home to see them much. I got mad at her and jerked her off the truck and grabbed Wendy around her throat and choked her to death; she tried to talk to me to get me to stop but I wouldn't listen; she was crying when I was choking her; several times while I was choking her she tried to tell me to stop but I was mad and just wouldn't listen to her. Finally she collapsed and fell to the ground as I'd been choking while we had both been standing. After she fell to the ground, I then picked her up and throwed her into the river. After I throwed Wendy in the river, she went down and then I saw her come back up for a moment and then she went back down under the water and I didn't see her come up again. The place where I threw Wendy into the river was up-river from the bridge and about as far up-river from the bridge as it is from the Court House to the jail house, also I remember that there was a fence fairly close to

**22.** See note 22 on p. 972.

For a number of reasons, we disagree with Judge Garza's statement. To begin with, there is no suggestion by *any* witness or *any* Court below that the two confessions may differ with respect to the amount of input by Jurek. Every witness who discussed the language of the confessions discussed both confessions together.[23] In addi-

where I threw her in the river. When I started to choke her, she kicked at me to try to stop me and she kept holloring at me to please stop, but I just kept on choking her till she couldn't fight back and then collapsed and fell to the ground. It was kinda hard to keep on choking her when she pleaded with me to stop, but I just kept on choking her till she fell to the ground; and her face had turned dark blue from my choking her. After I throwed Wendy Adams in the river I went and got in my truck and left and come back into town and went to Laake's and picked up Ricky Phillips; Richard Broz had gone home, so I went by Richard's home with Ricky to pick up Richard; then we three rode around till about 9:15 p. m. While I had drank several beers during the afternoon, I was not drunk and I clearly remember what happened. In the first part of this statement I called Richard Broz by his wrong first name and called him Mike; but his name was Richard. I have made this statement freely and voluntarily and nobody has forced me, threatened me or done anything to make me give this statement against my will.

22. The second confession reads in its entirety:

On August 18, 1973, I gave Robert Post a statement concerning the death of Wendy Adams who I choked and threw into the river. In the statement that I gave him I did not tell the truth about the conversation I had with Wendy at the river and about the prior discussion about trying to find some girls to pick up and I now herein wish to correct that statement.

Earlier on Thursday, August 16, 1973, when Richard and Ricky and myself were riding around drinking beer we talked about getting some pussy. I talked about Shirley Kay Range and how I wanted to get with her and get some pussy. Ricky mentioned Kathy Prause, who is a lifeguard, and said he wanted to get with her. When I am with the guys I talk beer and pussy.

When I took Wendy down to the river we were standing beside the truck outside on the driver's side. I asked her if she had ever had sex before and she said yes. I asked her if she wanted to have sex with me but she said no and started screaming and yelled "help" and "please don't kill me". So I started choking her. I put both hands on her throat and choked her. I reached forward and dug my thumbs into her throat beside her adams apple. I was picking up on her and she was kicking and scratching and trying to holler. My thumbs got tired and I had to move them at times. I had her against the truck holding her up. I choked her quite awhile and she fell to the ground and I let go.

I let her lay on the ground a short time and then picked her up and carried her toward the river. I layed her on the log and crawled under the log and then picked her up and threw her in the river. There were two little pipes sticking out of the water when I threw her in. She went down and then came up once a long ways down the river and then went down again. She came up a second time a short ways later and was floating face up.

When I told Mr. Post in my earlier statement that Wendy and I talked about my relatives at the river I was not telling the truth and I want to clear this up. After I threw her in the river I drove into town and got another six pack at Miss Kitty's, then picked up Ricky at Laake's pool hall, he was standing in front. I told him all I done was to get some beer and then we picked up Richard.

Everything else I have told Mr. Post in my prior statement is true and correct and I do not wish to change it.

23. For example, Dr. William McKinney, after carefully reading both confessions, testified that Jurek could understand the language in both and made no observation even remotely suggesting any possible language differences between the two:

Q [By the District Attorney] Now, let's get down into the—I want to refer to those, Doctor, down into the typed portion. I hate to take the time, but would you, in other words, quickly, but by the same token, not so quickly that you can't comprehend the contents, typed contents of both of those statements, would you scan them, look at them fairly carefully, and then let me ask you some questions after you have finished that, please, sir?
Just let me know when you are ready. For the record, I am showing you [the first and second confessions].
A Now, do you want me to read this statement, also?
Q Yes, sir. If you would, please, sir.
A All right.
Q First, referring to the top sheet, which I believe is marked in green ink State's Exhibit No. 1, now that you have had a chance to read the language that that statement is couched in, what is your idea of whether or not this is in language that would be understood and used by this defendant, or not, sir?
A Yes. I feel that this language would be understood by him.
Q The story that—as it's set out, as to what allegedly happened there, is there anything

tion, the panel opinion, although quoting language from the second confession, did not distinguish between the two confessions. See 593 F.2d at 677 & n. 5. Likewise, Jurek's own brief to the en banc Court did not attempt to separate the two confessions for purposes of analyzing their language. See Jurek's En Banc Brief, at 33. Judge Garza's argument concerning language and grammar distinctions between the two confessions comes not from any of the Courts or witnesses below, but from his own *de novo* language and composition analysis. Appellate Judges should not be in the business of independently analyzing the grammar and sentence structure of confessions, just as they should not and do not make *de novo* analyses of fingerprints, blood samples, voice recordings or other real evidence.

In any event, the testimony adduced at trial and the confessions themselves simply do not support Judge Garza's conclusion. To begin with, we have County Attorney Post's undisputed evidence that he took down the second confession as best he could from Jurek's own words:

Q [By the Defense Attorney] Now, Mr. Post, just prior to the recess, I asked you if you would deliver to me the notes which you made, which you used to produce the statement which is marked for identification purposes as Exhibit No. 2. . . . Mr. Post, in examining this, I find that it's, with very few exceptions, word for word like the statement. Now, my question originally was:

in that that you would question about this defendant's ability to understand and comprehend?
A There was one, one word that, you know, I questioned whether he had selected the word. But, otherwise, in general—
Q All right. Which would that be, if you recall?
A Let me—
Q Was that in the other?
A It may be in the other one.
Q Let's first talk about State's Exhibit No. 1, and then I will get to State's Exhibit No. 2.
A All right.
Q Or, if you recall what the word is—

Do you have any working notes, any just notations which you used and made at the time you were interrogating Jerry Jurek, which you used to compose this statement that was signed? Now, this is a rough draft of the statement.

A This is exactly what he gave me. I took it down. I have nothing else.

Q And you will tell this Court and this jury, and me, that this boy, sitting right here, just without any prompting from you, particularly, and in this chronological order, without any breaks, gave you this statement?

A In effect, yes. I asked him—we had—I had asked him, as I said, Mr. Nelson [a Texas rancher] and myself and Mr. Cheatham and Mr. Jacob [a cattle ranger]. He then said he did no longer wish to stand on his first statement; he wished to change it.
I said, "Jerry, tell me about it."
And he did. And if he would pause, I presume I'd say, "What happened then?" Or, "Next?" "Keep going." Other than that, it's exactly as what is there.

Q And you are not—are you telling the Court that this is the language that this boy used when he talked to you, or is this your way of putting down your interpretation of what he said?

A As best I could, I put down exactly what he told me.

Q In the words that he used?

A As near as possible as I could, yes, sir.

A No. I—I—I don't. I just noticed it as I glanced through it. And I don't find the word specifically right here.
Q All right. Now, let me refer to State's Exhibit No. 2: Did you—can you tell this jury whether or not, in your opinion, from the examination that you made of this defendant, whether or not he could understand and comprehend the story that's told in that statement?
A Yes. I believe that he could.
Tr., Vol. VIII, 1694–96. If the language differences were as glaring as Judge Garza suggests, why did not Dr. McKinney (or some other witness) bring this fact out?

Tr., Vol. VI, 1353–54. Since Jurek was required to come forth in the Federal habeas proceeding with facts to rebut this undisputed testimony, and since Jurek did not do so, this testimony by Post remains undisputed.

More importantly, a reading of the two confessions demonstrates that Judge Garza has grossly exaggerated language differences between the two confessions. Reasonably sophisticated sentences can be found in the first confession. E. g.,

> In the first part of this statement I called Richard Broz by his wrong first name and called him Mike; but his name was Richard. I have made this statement freely and voluntarily and nobody has forced me, threatened me or done anything to make me give this statement against my will.

On the other hand, the second confession hardly bears the stamp of a college English professor. E. g.,

> [W]hen Richard and Rickey and myself were riding around drinking beer we talked about getting some pussy. I talked about Shirley Kay Range and how I wanted to get with her and get some pussy. . . . When I am with the guys I talk about beer and pussy.[24]

In addition, a reading of the second confession demonstrates as a matter of common sense that the prosecutors did not put words into Jurek's mouth. At one point the second confession states: "I asked [Wendy] if she had ever had sex before and she said yes." Wendy's body was discovered on the morning of August 18, Tr., Vol. VII, 1648 (testimony of Raymond Tate), and an autopsy was thereafter performed that same day. The autopsy made clear that Wendy had never had sexual intercourse with anyone. Tr., Vol. VIII, 1536–37 (testimony of Dr. Paul Obert). At about 7:30 p. m. on the evening of August 18, Jurek made the second confession. The record is unclear as to whether the results of the autopsy were at that time available to Post. If they

were, then Post would of course have known that Wendy had never had sexual intercourse. But even if the autopsy was not in Post's hands, common sense would have suggested to him that it would be extremely unlikely that ten year old Wendy Adams would have told Jurek that she had had sex before. In our view, the insertion of the above-quoted statement justifies the implied conclusion of all the Courts below, State and Federal, that the State was putting into the second confession whatever Jurek said regardless of its plausibility or lack thereof and was not drafting the confession for Jurek.

Considering the testimony of Post, along with the language of the confessions, their substance, and the fact that not a single witness or Court below—on trial or habeas—had ever suggested a distinction between the two based on composition and grammar, we believe that Judge Garza was unwarranted in making his own independent comparative analysis of the two confessions.

### b. Purposefulness Of The Conduct Of The State Officials In Obtaining The Second Confession

In distinguishing between the two confessions, Judge Garza also emphasized that while the circumstances surrounding the first confession gave "little to indicate that the prosecutors were striving for any result other than the solution of the crime and the recovery of Wendy Adams' remains," Garza Op. at p. 940, the second confession was undertaken with "the purpose of amending [the first] confession to secure the death penalty." Id. at p. 941.

In Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the Supreme Court stated:

> The police were not . . . merely trying to solve a crime, or even to absolve a suspect. . . . They were rather concerned primarily with securing a statement from the defendant on which

---

**24.** We sympathize with Judge Garza's decision not to quote the obscene language contained in the confessions. Yet, since a major argument in his opinion involves language differences between the two confessions, both confessions must be analyzed in their raw entirety.

they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession must be examined with the most careful scrutiny . . . .

*Id.* at 324, 79 S.Ct. at 1207, 3 L.Ed.2d at 1272. Relying on *Spano*, see Garza Op., p. 939, Judge Garza apparently reasons that the second confession is particularly suspect because the prosecuting attorneys were motivated solely to get the death penalty while, when eliciting the first confession from Jurek, they were carrying out legitimate law enforcement aims.

While the considerations expressed in *Spano* may in some circumstances be decisive,[25] we believe that Judge Garza has misapplied the reasoning of that case. To begin with, Judge Garza's extremely liberal interpretation of *Spano*, even if we were to accept it—which we decline to do—would seem to apply equally to the first written confession as well as to the second. In Austin, Jurek made an oral confession[26] that led to the finding of Wendy's body.[27] Thus, Judge Garza was incorrect in stating that the first written confession was essential for "the solution of the crime and the recovery of Wendy Adams' remains." Garza Op., p. 940. Moreover, District Attorney Cheatham, who prosecuted the case, believed that the oral confession was *admissible*.[28] Thus, before obtaining the first confession, the prosecuting attorneys had what they thought they needed, not only to locate the victim but to help convict Jurek. Sure, a written confession would be less

---

**25.** But see Note, Developments in the Law, *supra* note 18, at 973:

The Court's willingness to tolerate pressure only when it is investigatory, not when it is a search for evidence, overlooks the fact that the function of the police is to help obtain convictions, not merely to secure enough evidence to justify charging a suspect. In any event, this factor never seems to have been controlling in any of the Court's decisions, but rather seems, like references to "illegal" conduct, to shore up judgments arrived at by another route. (Citations omitted.)

**26.** Actually, Jurek gave a number of slightly different accounts of the crime, the precise details of which are not in the record.

**27.** As District Attorney Cheatham stated at his deposition:

Q [By the Defense Attorney] All right, with regard to the statement which was given by Jurek in Austin after the polygraph, did that lead to the—in your opinion to the plot of the crime?
A Well, I don't know whether you can say that or not, it led to finding of the little girl's body the next day.

Cheatham Dep., 38.

**28.** As Cheatham stated at his deposition:

Q [By the Defense Attorney] Had you not been able to get a confession in writing? Which you were able to do? Would it have been your position do you feel that the statements given to the officers in Austin would be admissible under this oral confession rule we had?
A Of course, that was always a question in my mind. I felt that it would have been.

Q Might have been admissible even though he subsequently got a couple of written confessions from him?
A Well, I took that position, but I didn't—I didn't press it because it didn't become necessary, but I felt about it this way, if he had not given written statements, I certainly would have done everything that I could have done in a legal manner to have that proposition of law where they disclose the location of the truth of the crime or the murder weapon or whatever, that that would make that oral statement admissible.
Q So what you really—
A But it didn't become necessary.
Q You didn't feel like you needed to get a conviction?
A I think I could still convict a man if—I may be wrong, but I'm not no brag, just fact, I believe I could still put it on him if I didn't have a statement. It may not be as clear cut and strong.
Q But actually, what you had in your opinion as a prosecuter, you had three statements, you had two—
A Right.
Q —written statements and you had one which was oral, which you also thought was admissible?
A It would have been, I'm sure, it would have been attacked as to whether or not it would have stood up. Well, they know, because it didn't come up.
Q I understand, but it's your opinion as a prosecuter that was admissible?
A I think it probably would have been.

Cheatham Dep., 38–40. Thus, at least in the mind of the prosecutor, "a valid confession solving the crime had been obtained," Garza Op., p. 941, before the first written confession.

risky from the standpoint of admissibility and would also be more persuasive to the jury, but these are precisely the considerations which the Court in *Spano* arguably had in mind when writing the above-quoted language.[29]

We emphasize that we are not trying to argue that the first confession was coercive under *Spano*, but simply that the circumstances surrounding the two confessions were not that different. Indeed, as we indicate below, we believe that Judge Garza's reading of *Spano* (which we are merely applying to the first confession as well as the second) is incorrect and is, as a practical matter, unworkable.

Perhaps Judge Garza intends to argue that while *Spano* considerations apply even with respect to the first confession, they apply *more heavily* with respect to the second, because the prosecutors were driven in obtaining the second confession by a desire to secure the death penalty, not merely to convict Jurek. Yet, in our view, Judge Garza's (and the panel's) suspicion that the prosecutors were motivated by death penalty considerations at the time of the second confession is based not on evidence in the record but on the surmise of these Judges.

Indeed, the evidence rebuts a drive on the part of the State to ensure that the death penalty was obtained. Nowhere does any witness testify that Jurek's second statement was essential to get the death penalty. On the contrary, District Attorney Cheatham testified that, in his view, there was clearly enough evidence for the death penalty without the second confession because kidnapping, like rape, is an aggravating factor under Texas law: [30]

To me there was, from my view, from a legal standpoint, and I might be wrong, but from my view there wasn't any question of whether he had admitted a capital case. You had kidnapping and you had murder and if there is one of those elements, if they have its murder committed in the course of either attempting or kidnapping so under the second statement I think you had another aspect of it but in my opinion this was it, this was capital murder in the first statement. In fact, it was capital murder before I ever took it from what he told them up in Austin.

Cheatham Dep., 65.[31]

What the prosecuting attorneys were trying to do was not necessarily to secure the

---

**29.** Nor could Judge Garza be reasonably arguing that the State should at least be entitled to a written confession before *Spano* considerations come into play. In *Haynes v. Washington, supra*, the suspect made two oral confessions before police obtained a written one on which the case turned. The Court observed that "the procedures [were] perhaps more unwarranted because so unnecessary." 373 U.S. at 519, 83 S.Ct. at 1346, 10 L.Ed.2d at 524.

**30.** See Texas Penal Code Art. 1257(b).

**31.** While we do not know exactly how much evidence the State had in hand prior to obtaining Jurek's second confession, it is worth pointing out that Cheatham's belief that there was evidence of kidnapping sufficient to establish an aggravating factor for purposes of the death penalty statute had plenty of support. Strong evidence of kidnapping was presented at trial. For example, Patricia McMahan testified:

Q [By the District Attorney] All right, Mrs. McMahan, directing your attention back to Thursday, August the 16th, 1973, had you—
Let me ask you this: What time did you get off work that day?
A At 5:00.
Q Did you go home?
A Yes.
Q After you had gotten home, I will ask you whether or not you heard any type of unusual noise that attracted your attention?
A I did. I heard a car coming at a very high rate of speed, and a child in the back, hollering. And I went outside. And by the time I had gotten outside, the car had gotten into the beginning of the 300 block of Reuss—
Q All right. Now—
A —and of East Reuss. And there's a manhole like in the street, and it hit this. And the child that was in the back seat bounced up—of the truck—and was, of course, screaming.
Q What type of vehicle was this that you saw?
A It was an older model blue truck that looked like it had been, I'll say, homemade painted. It didn't look like a professional paint job on it.
Q All right. Let me ask you this, Mrs. McMahan: Could you give us any type of description of the girl that you saw? Now, a while ago, I believe you said in the back of a car.

death penalty but *to solve the crime* by establishing just what the true circumstances were surrounding Wendy's death. The reasons given by Jurek in the first confession for killing Wendy—that Wendy made nasty comments about Jurek's brother and told Jurek he should not be drinking, are incredulous on their face. As District Attorney Cheatham testified:

> I can't conceive of somebody going out and snatching up a girl, a little girl in a bikini, racing all through town, hollering, screaming for help, to ask her how she liked his kinfolks. Just being perfectly blunt about it, I just can't conceive of a

man doing that under those circumstances without some further ulterior motive. Cheatham Dep., 63.[32]

Judge Garza's approach to *Spano* would mean that once the police have identified the person who committed the act that caused the death, they must cease all interrogation or risk that any confession obtained will be held inadmissible. *Spano* does not stand for any such unrealistic proposition. What if Jurek had stated that he was responsible for Wendy's death but that it was an accident? What if he stated that Wendy was dying of cancer and asked him to kill her as an act of mercy? In the interest of law enforcement, *Spano* must

A Well, I meant pickup. In the back of the pickup.
Q By that, do you mean in the bed of the pickup?
A In the bed of the truck. All I know is—is it was a small, blonde headed child. That's all I can say.
Q All right. And was she quiet while this was going on, or saying anything?
A No, she was holding on and hollering.
Q All right. Let me ask you this, Mrs. McMahan:
 I will ask you whether or not you had an occasion to see the same truck the next day?
A I did.
Q And where was this, please?
A It was over on Hunt Street.
Q All right. And at that time, did you know whose truck it was when you saw it?
A Well, I felt it was the same one that I had seen.
Q Well, did you receive information from anyone as to whose truck it was at the time you saw it the next day?
A Yes.
Q Who, please?
A It belonged to Jureks.
Tr., Vol. VII, 1547–50.
And George Villa testified:
Q [By County Attorney Post] Is there anything unusual that you saw or heard [on August 16, 1973 at about 5:30]?
A Yes. Well, as we were going north on Esplanade, we were about in the vicinity of the Bottom Dollar. And a truck ran a stop sign there and nearly ran into a big truck. And it had a little girl in the back of the cab.
Q Okay. Could you describe the truck that ran that stop sign for me, please?
A Yeah. Well, it was an old model truck, hand-painted, blue and beige, I think.
 \* \* \* \* \* \*
Q . . . Could you see inside the cab of the pickup?

A No. By the time I noticed it, it had already turned, by the time I noticed that it had ran the stop sign—
Q Okay.
A —and I just saw one person inside. And I didn't get to see who exactly it was.
Q Okay. So you didn't recognize who was in the pickup?
A No.
Q But it was just one person, is that correct?
A Yes, sir.
Q All right. You said there was a little girl?
A Yes, sir.
Q Where was she, if she wasn't in the cab?
A She was in the back.
Q In the bed of the truck, then?
A Yes, sir.
Q Did you get a look at her?
A Yes. But she screamed right at us, as he made the turn, she was screaming right at us.
Q Okay. Were you able to hear what she said?
A Yeah. Well, at first, we couldn't make out what she had said. But then, later we figured out that she had said, "Help me, please."
 And she really stressed the "please" part.
Q Okay. Were you able to get a look at her?
A Yes.
Q Could you describe her to me, please?
A Yes. Well, she was blonde. And she had on a flowered-colored two-piece suit. About nine years old.
Tr., Vol. VII, 1577–79. Other evidence linked Jurek specifically to the truck. See, e. g., Tr., Vol. VII, 1465 (testimony of Richard Broz).

**32.** Judge Garza ignores the implausibility of the explanation in the first confession, and simply concludes that "a valid confession *solving the crime* had been obtained." Garza Op., p. 941 (emphasis added).

permit law enforcement officers to secure a plausible, and hopefully true, version of the events surrounding a crime before subsequent confessions are subject to the sort of rigid scrutiny to produce inadmissibility. Thus we would hold that at the time of the second confession, the prosecuting attorneys were still "merely trying to solve a crime" and were not "concerned primarily with securing a statement from defendant on which they could convict him." *Spano, supra*, 360 U.S. at 324, 79 S.Ct. at 1207, 3 L.Ed.2d at 1272.[33]

### c. Other Factors

In addition to the two factors discussed above, Judge Garza's opinion emphasized the need for counsel at the second confession and the fact that none was appointed. The opinion also emphasized the fact that Jurek had been in custody for a much longer period of time when the second confession was obtained. We find these contentions unpersuasive.

With respect to the appointment of counsel, we think Judge Garza has exaggerated the greater need for counsel at the time of the second confession than at the time of the first. In our view, it is equally the case that "no court-appointed attorney worth his salt," Garza Op., p. 941, would have consented to Jurek signing the first confession (as well as the second). Certainly Jurek had received no promises of leniency, let alone a clear-cut plea bargain proposal. Moreover, as we stated above, the prosecutor thought that the first confession, plus

the independent evidence adduced at trial, would have supported the death penalty under a kidnapping theory. Thus Jurek may well have been signing his life away with the first confession. But, as we have pointed out, Jurek did not request counsel before either of the two confessions. And, as we show below, Jurek was repeatedly given *Miranda* warnings and several witnesses ensured that the second statement was voluntary. We think it wholly unacceptable that a confession should be thrown out because a lawyer was not forced upon Jurek against his repeated statement that he did not want a lawyer. *Cf. Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1974).

Thus we are left with the physical fact that at the time of the second confession Jurek had been in custody for about 18 hours after the time of the first one. As the undisputed evidence in the record makes clear, after making his first confession (at 1:15 a. m.), Jurek was immediately transferred at his own request to the Victoria Jail and did not return to Cuero until 2:00 p. m. that day. Tr., Vol. VI, 1324–25 (testimony of County Attorney Post). He presumably slept throughout the night at the Victoria Jail. Tr., Vol. VI, 1336 (testimony of County Attorney Post). He was questioned briefly that afternoon. See Tr., Vol. VI, 1326–27, 1329–30 (testimony of County Attorney Post). It is undisputed that at the time of the second confession (7:30 p. m.), Jurek was fresh and alert. See, e. g., Tr., Vol. VI, 1331, 1336–37 (testimony of County Attorney Post). There is

---

**33.** In quoting District Attorney Cheatham's testimony, see Garza Op., pp. 934–935, and in analyzing the composition of the two confessions, Judge Garza implies that Cheatham simply had a "hunch" that sex was involved and that Jurek was called back for the second confession and in essence told what to say. We have already indicated our disagreement concerning the asserted composition differences between the two confessions. See *supra* at pp. 971–974. Moreover, it should be emphasized that the prosecuting attorneys did not pull a theory out of the air and attempt to get Jurek to embrace it. Rather, Cheatham knew that Jurek had on a number of occasions been under suspicion with regard to sex offenses involving young girls. Cheatham Dep., 8, 12.

Moreover, the undisputed evidence established that after Jurek gave the first confession but before he gave the second one, the State learned through independent evidence that on the afternoon of the murder, Jurek had been searching for a girl with whom to have sexual relations. Tr., Vol. VI, 137 (testimony of County Attorney Post). The prosecuting attorneys were merely confronting Jurek with the facts they had obtained—a common law enforcement device. To require these law enforcement officials to remain silent, not giving any direction to the interrogation, would be to hold these officials to an unreasonable standard, one that would cripple the police in their effort to solve crimes.

not one whit of evidence of any violence, coercion or threatening police or prosecutor tactics during the 18th of August. Consequently, no importance can be attached to the fact that several hours separated the two confessions.

### ii. Other Circumstances Demonstrating The Voluntariness Of The Second Confession

Neither the panel nor Judge Garza gave any weight to the fact that the signing of the second confession was observed by four witnesses selected from the community, and that two of these witnesses testified at length that they fully believed that Jurek's second confession was voluntary.[34] For example, Darrell Cooper, a real estate broker and a witness to the signing of the second confession, testified at length concerning the circumstances surrounding the signing of the second confession. Cooper testified that the second confession was read to Jurek word for word before he signed it. Tr., Vol. I, 54. He also testified that both the first confession and the second confession were explained to Jurek thoroughly in front of all four witnesses. Tr., Vol. VI, 1423. And he stated that Jurek confirmed in his own words that both the first and second confessions were voluntary. Tr., Vol. VI, 1423–24.

Cooper also testified that Jurek was asked whether he wanted an attorney and that Jurek said no:

Q [By Jurek's Attorney] Was an attorney present when this was signed?

A Not for the defendant, for Mr. Jurek. He said he didn't want one.

Q Mr. Jurek said he did not want one? Were you present when Mr. Cheatham asked him if he wanted one?

A Yes, sir.

Q Did Mr. Cheatham make any efforts to actually see that he had a lawyer?

A Well, now, this, I don't know. But the boy said he didn't need an attorney.

Q Were you there when Mr. Cheatham or anybody else gave him what we call the defendant's rights?

A Yes, sir, I sure was.

\* \* \* \* \* \*

Q Did they make any effort to actually appoint one prior to his signing this thing?

A Well, Mr. Jurek said he didn't want one. In other words, at that point in the thing, when Mr. Post was reading his rights, they asked him did he want an attorney present. He said no. And then, I think Mr. Cheatham told him that he had the right to have an attorney present; if he couldn't afford one, that—that—well, I don't remember the details. But, anyway, to the effect that the county would appoint an attorney to represent him if he did not have the money to hire an attorney.

Q But they just told him this, now; they never actually urged him to tell them to go out and get him an attorney, did they?

A Well, I don't think they urged him to get an attorney, but they told him he could have one if he wanted one.

Q Did they impress upon him the fact that it wouldn't cost him a penny?

A Yes, sir.

Tr., Vol. I, 55–56, 59–60. See also Tr., Vol. VI, 1417 ("I know several times Mr. Cheatham and Mr. Post both told [Jurek] that he had the right to have an attorney present, I know.").

Moreover, Cooper testified that Jurek was given no promises of better treatment by making the second confession and, on the other hand, was not threatened in any way about the consequences of not signing it. Tr., Vol. VI, 1425. And according to Cooper, Jurek told the four witnesses and the prosecuting attorneys that he was making the second confession because he did not

34. The signing witnesses were: a real estate broker, a bank vice-president, a manager of an electric company, and an employee of a radio station. Tr., Vol. VI, 1420 (testimony of Darrell Cooper).

tell the truth in the first one and wanted to set the record straight. Tr., Vol. I, 63–64, 75; Vol. VI, 1424.[35] Additionally, Jurek reconfirmed that the first confession was given voluntarily. Tr., Vol. I, 66–67. Cooper testified that he did not observe anything to indicate that Jurek was coerced. Tr., Vol. I, 70. And he believed that Jurek knew the consequences of what he was signing. Tr., Vol. VI, 1415 ("I don't think there was any doubt in the boy's mind that evening but what he knew what he was signing and the consequences of signing.").

A second witness to the second confession was Robert J. Pickens, Vice-President of the Buchel Bank & Trust Co. in Cuero and a licensed attorney. Pickens recalled that Post read the second confession to Jurek out loud and that the statement was handed to Jurek for him to read. Tr., Vol. VI, 1432. Moreover, Pickens testified at length that Jurek was given his *Miranda* warnings before signing the confession. Tr., Vol. VI, 1432–35, 1440. Pickens also confirmed that Jurek was asked whether the statement was voluntary, Tr., Vol. VI, 1437, and that Jurek stated that he was not in any way coerced into making the second confession. Tr., Vol. VI, 1439–40. Pickens also testified that he observed nothing that in any way suggested that Jurek was coerced into confessing. Tr., Vol. VI, 1440.

Thus, both of these witnesses testified that Jurek stated that the second confession was voluntary, that Jurek was given his *Miranda* warnings, and that there was nothing to suggest any coercion. We must keep in mind that these witnesses had an opportunity to observe Jurek's demeanor and to listen to him state in his own words that he did not want an attorney and that the confession was voluntarily given.

The testimony of these witnesses is consistent with that of County Attorney Post.

Post testified that he gave Jurek his *Miranda* warnings before the second confession was made by Jurek. Tr., Vol. VI, 1292–93, 1365. Moreover, according to Post, Jurek confirmed that both the first and second statements were freely and voluntarily given. Tr., Vol. VI, 1365. In addition, Post testified that he read the second confession to Jurek a few sentences at a time, and asked Jurek to confirm the correctness of each part and to indicate whether he wanted to make any changes. Tr., Vol. I, 127.[36]

The testimony given by Post and the witnesses is, we emphasize, undisputed. Jurek brought forth no facts at the Federal habeas hearing to challenge the circumstances surrounding the signing of the second confession.

### III. Conclusion

As appellate Court Judges, we can never learn fully what took place during the 42 hours between Jurek's arrest and the time he gave the second confession. We must render a difficult constitutional decision solely on the basis of the voluminous record which we have before us. We can do no more than examine the evidence in light of our common sense as Judges and as human beings. A careful reading of the record convinces us that the findings of voluntariness by the jury, the State Trial Court, the State Appellate Court and the Federal District Court were sound. The various Supreme Court cases finding confessions involuntary present factual settings wholly unlike the one before us. The evidence in this case simply does not establish that Jurek's will was overborne or that his confession was not the product of a rational intellect and a free will.

We in no way advocate a loosening up of standards concerning the voluntariness of confessions. If anything, our lengthy dis-

---

**35.** Feelings of guilt and a desire to clear one's conscience are of course not uncommon reasons for confessing. See, e. g., Lederer, The Law of Confessions—The Voluntariness Doctrine, 74 Mil.L.Rev. 67, 71 (1976).

**36.** Post did concede, however, that he did not tell Jurek that he could go to the electric chair

by signing the second confession. Tr., Vol. VI, 1366. But the Courts have never held that when a defendant insists he does not want a lawyer, *the State* must give him unsolicited legal advice concerning possible sentences that may result from a conviction based in part on a confession given by a defendant.

cussion makes clear to law enforcement officials that when a confession is challenged as being coerced, Courts will—and must—make a careful, in depth analysis of the record. But when the facts clearly support a finding of voluntariness, we would serve no interest of any kind by reversing a criminal conviction obtained in full regard of a defendant's constitutional rights.

REAVLEY, Circuit Judge, with whom COLEMAN, Chief Judge, BROWN, AINSWORTH, CHARLES CLARK, GEE, TJOFLAT, and FAY, JJ., join, dissenting:

From his arrest in August of 1973 to the federal court's 18 page decision on his habeas corpus claims in January of 1978, Jerry Jurek has always received fair treatment. His constitutional rights have been rigorously observed and protected. The record entitles all participants in this record to take pride in their skill and performance of duty under the law. This includes the Cuero police, the magistrate, the two prosecutors, the two defense attorneys, the state trial and appellate judges, as well as the lawyers and the federal district judge who surveyed the constitutional issues. All are entitled to commendation.

There is some room to disapprove aspects of the police conduct. If they took Jurek to jail without his shirt and shoes, that was unnecessary. It would have been preferable for officer Adams to let the other officers deal directly with the one suspected of harming Adams' own child. There is no sign anywhere in the record, however, that Jurek was mistreated. Adams, understandably upset by the disappearance of his daughter, only questioned Jurek for 35 minutes—and obtained no information or admissions. Either Adams exercised remarkable restraint (along with Chief Wright and Officer Boldt) or Jurek is far from the weak and pliant person we read about in the accompanying opinion. I submit that the record establishes both: all officers conducted themselves with respect for the rights of their prisoner and Jurek did have the capacity to understand his problem as well as his rights.

There was a twelve hour delay in presenting Jurek before a magistrate. The trip to Austin for the polygraph test (to which Jurek consented) took most of the day, and Jurek was repeatedly warned and told of his rights. Nevertheless, the Texas statute required that he be brought before a magistrate without unnecessary delay, and it should have been done on Friday morning instead of that evening. This only bears on the scorecard of the police, because no one can say that there was a causal connection between the failure to take Jurek before the magistrate that morning and his confessions that night. *See Smith v. State*, 171 Tex.Cr.R. 313, 350 S.W.2d 344 (1961), *cert. denied* 368 U.S. 883, 82 S.Ct. 126, 7 L.Ed.2d 83.

From the moment District Attorney Cheatham entered the picture, there are no more openings for fault finding. He had held that office 17 years at the time of this offense and obviously knew his business. He had been away from Cuero on Friday and first heard of the missing child and Jurek's implication when he returned late in the afternoon. When he was told that Jurek had admitted guilt and would be returned to Cuero by 9:30 or 10 o'clock, Cheatham made arrangements for the magistrate and officers with Jurek to meet at the courthouse. The magistrate and Jurek went into an office alone in order that another warning could be given and the magistrate could see that Jurek's rights were fully explained to him. Thereafter, during the discussion and interrogation that night, Jurek was offered coffee and soda water—and often told of his rights. Cheatham testified: "I'll say one thing, he was one of the most warned defendants that I guess was ever warned." The objection raised here to the nighttime trip to the river shows a lack of realization of the need to find the person or body of the child missing for 30 hours. This and other objections in the court's opinions manifest an insensitivity to the record and its necessary implications which goes far to explain the errors of the court.

I search this record of what transpired on Friday night when the first written confession was taken and on Saturday afternoon when the second one was taken, and I can find no transgression in the slightest degree. An experienced prosecutor was doing his job exactly the way everybody should want him to do it. *Everybody*: citizens, people accused of crime, and judges.

But my fellow judges disagree. They say Jurek's psychological capacity prevented him from knowingly and voluntarily confessing under these circumstances. They say Jurek did not waive his right to counsel. Then they say that they can look at the second confession and tell that it did not come from Jurek. In my humble opinion, these objections are easily overcome by a study of the record.

First: Jurek's psychological limitations. There is evidence of this 22 year old Anglo male's dull intellect; but he was not mentally ill or seriously defective. The expert testimony is that Jurek could understand his rights if explained to him. During the state trial the defense presented a psychiatrist, a clinical psychologist, and a general practitioner. The jury was told that Jurek had low average intelligence, that he had difficulty comprehending and thinking matters through. The federal judge heard two clinical psychologists called by Jurek's attorneys. They said Jurek might have understood the *Miranda* warning and he might not have understood. Dr. Adams said: "It is my contention that he probably did understand it [the *Miranda* warning] if it were presented—if it were explained to him, I think he would have ability to understand it." The question, then, is no more than whether or not the points were fully explained to Jurek. The answer depends on whether we believe the magistrate, county attorney, district attorney, and the three persons who witnessed Jurek's signing and declaration of the confessions and who testified at trial. They all testified of full and frequent explanations of these rights to silence and counsel—to an alert, willing and apparently understanding Jurek. I can conceive of no reason to disbelieve or discount their testimony.

Second: waiver of counsel. Five witnesses testified that Jurek expressly refused assistance by counsel during the declaration of these two confessions. The magistrate began his warning on Friday night by asking Jurek if he wanted an attorney before anything else was done or said. Jurek said he wanted to go ahead without a lawyer.[1]

---

1. My brother Johnson writes: "When he was taken before the magistrate, charged with 'murder with malice,' and read his rights, Jurek told the magistrate that he could not afford a lawyer and that one would have to be appointed for him. The magistrate's response was to tell him that he had a right to appointed counsel at trial."

Compare the record.

The State introduced a magistrate's certificate as an exhibit, signed by the magistrate and by Jurek, wherein it is stated that Jurek was informed of the accusation against him and of his rights, including: "1. He was entitled to the services of a lawyer of his own choice to represent and advise him before making any statements or answering any questions by any *peace officer or attorney representing the state.* 2. If he could not afford to hire a lawyer he could ask for and received the services of a lawyer appointed to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the state, *without any cost or charge to him.*"

During the state trial the magistrate testified as follows:

Q Mr. Albert, let me show you the Defendant's Exhibit No. 1 again.
A Yes, sir.
Q And, in other words, as I understand you, before you gave him this warning, you asked him if he wanted a lawyer or anyone present—
A Yes, sir, I told him.
Q —when you read him this, is that right?
A Yes, sir.
Q And explained to him he had a right to have a lawyer present if he wanted to have one?
A Present. When I asked him and gave him this warning, he said "No", just go ahead and give it to him, which I did.
Q Okay. Okay. Did he sign it down at the bottom?
A Yes, sir. Yes, sir.
Q Is that his signature?
A That's his signature there.
Q All right. And you saw him place his signature on that statement, is this correct?
A Yes, sir, and then, I went back and put the Justice of the Peace seal on it, after he signed it.
Q All right, sir. And in addition to your oral explanation of it to him, you, do I under-

The prosecutors on several occasions during the discussion and preparation of the two written confessions reminded Jurek that he could stop then and get a lawyer. Jurek did not want a lawyer. In 1969 he had declined a lawyer, had testified before the grand jury investigating accusations against him of committing a sex crime against a girl, and had gone free. It worked then for him. (That, and the fact the girl's mother asked the grand jury not to indict.)

Judge Johnson constructs a *Miranda* problem out of two places in the testimony of the magistrate during the hearing in state court on defense motions. In the first instance Jurek's lawyer was complaining about the size of the bond which the magistrate had set. The magistrate was asked if he knew the financial standing of Jurek's family when he set the bond, and in his answer the magistrate included information gained from talking to Jurek: that Jurek "could not afford a lawyer and the Court would have to appoint him one." Later Jurek's attorney inquired about the time or date when the prosecutors advised the magistrate that he should proceed to appoint an attorney for Jurek. (This transpired after the weekend when the confessions were made; the magistrate appointed the attorney four days later.) The magistrate was explaining his later appointment when he said that he had told Jurek *had to have* a lawyer when he went to court. And Jurek had told the magistrate he understood that. Jurek did not request an attorney on Friday evening, equivocally or otherwise. He said repeatedly to several witnesses, as well as to the magistrate, that he did not want a lawyer appointed. When the magistrate told him it would not be up to him when he got to court, he said he understood that and when the time for court came a lawyer would have to be appointed because he could not afford one. I perceive no other reasonable interpretation of this record.

stand, read all of this to him, that listed some five different rights which you have?

A That's right. Yes, sir.

Q And in the No. 1 here, does it say:
"He was entitled to the services of a lawyer of his own choice to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the State"? You read that to him, is that right, sir?

A Yes, sir. That's right. I read that to him. And that's when I stopped and talked to him and asked him about that.

Q Is that when he told you he didn't want the lawyer?

A Yes, sir.

Q And then, "If he could not afford to hire a lawyer he could ask for and receive the services of a lawyer appointed to represent and advise him before making any statements or answering any questions by any peace officer or attorney representing the State, without any cost or charge to him"?

A I read—

Q Did you read that to him?

A I explained that to him.

The record is replete with corroborative testimony that Jurek declined an attorney prior to the confessions. For example, testifying about what transpired immediately after the discussion between the magistrate and Jurek, the county attorney said:

Q All right, sir. And before this statement was taken, I will ask you whether or not Jerry Jurek was—or, Mr. Ley was brought up to the courthouse and asked to give the Magistrate's Warnings to Jerry?

A Yes, he was.

Q All right, sir. And I will ask you whether or not you placed that information in the statement—

A Yes, sir.

Q —at the time it was—

A Yes, sir. Yes, sir, I did.

Q All right, sir. And I will ask you whether or not you gave the defendant his warnings?

A Yes, I did. And, in fact, I customarily read and, in this instance, I did, also. I read directly from the statement form, itself.

Q The statement, itself. All right. Did you read the complete printed warning that appears on State's Exhibit No. 2—

A Yes, sir.

Q —to this defendant, prior to his making any statement?

A Yes, sir, I did.

Q All right, sir. And, in other words, did you inform him that he was facing a murder charge of little Wendy Adams?

A Yes, sir, I did.

Q And that he had a right to retain counsel, and if he could not obtain counsel that one would be appointed for him?

A Yes, sir, I did.

Q Did he make any requests for counsel there at that time?

A No, sir. In fact, he stated that he did not want an attorney at that time.

Even the resourceful counsel for Jurek gave the matter only a half page of attention in their brief before this court.

Finally: the second statement. The most curious feature of our writings is the pronouncement that the second confession is a fraud, because we now decide that it could not have come from Jurek. All of the psychologists and the psychiatrist who examined Jurek could not see this. The four witnesses to the confession, all prominent citizens, somehow missed it. The vision appears suddenly to us, but from what source shall forever be untold. To accept this we reject as untrue the detailed testimony of the county attorney as to how the statement was written by him from Jurek's words. We include the district attorney as a party to the design to record Jurek as saying what he did not say.

The record does not support these abrupt appellate departures, departures presumably grounded in a compassion for the miserable Jurek; and while I do not suggest that compassion should not figure in our deliberations, I do maintain that others who must bear consequences of this terrible crime deserve at least an equal compassion. Further, the law enforcement officers, prosecutors and trial judges—who labor under great strain—are entitled to have their actions viewed in an even-handed manner. These competing interests and considerations would be best resolved here by our hewing to the law and to the record.[2]

There is talk in the other opinions of the importance of the prosecutor's purpose in obtaining a first written confession and then an additional one, and there seems to be an aspersion cast against the prosecutor for wanting a statement of what he be-lieved to be "the truth." We are cited to *Clewis, Haynes, Watts* and *Chambers* by the Supreme Court. I understand "the truth" to be placed in quotation marks because it may be something other than truth or because the Court objects to the exercise of undue influence by the authority, imposing what the authority thinks is true irrespective of what the accused knows or would otherwise voluntarily state. The Court has also stated that successive statements are a warning sign and call for strict scrutiny. Then let there be strict scrutiny, for it will disclose no distortion or undue influence upon Jurek. It shows, to the contrary, that the confessions included minor exculpatory fabrications by Jurek rather than what the district attorney suspected, and that the true facts were probably worse than Jurek ever admitted.

Are we to say that the prosecutor, after being told by witnesses that Jurek went to the park in search of sex with a young girl, may not ask him if it was so? And may the prosecutor not discuss Jurek's statements to point out contradictions and apparent falsehoods? Must the prosecutor accept the first statement of the accused without doing more to discover and prove the actual deed? Are we to brand any subsequent confession as involuntary because of a prior unwillingness to admit full guilt? My answer is that the Constitution insures against coercion and the denial of the rights of silence and counsel, but it does not bar the solution of crime.

I agree with the district judge in rejecting all of the contentions made by Jurek's counsel on behalf of the writ. I add only a word on the *Witherspoon*[3] point. The Su-

---

**2.** Mr. Justice Frankfurter once wrote:

"The nature of the duty [of judicial review] . . . makes it especially important to be humble in exercising it. Humility in this context means an alert self-scrutiny so as to avoid infusing into the vagueness of a Constitutional command one's merely private notions." *Haley v. Ohio*, 332 U.S. 596 at 602, 68 S.Ct. 302 at 305, 92 L.Ed. 224.

**3.** The panel opinion states that George Middaugh, Jurek's attorney during the state trial, was apparently ignorant of the defendant's rights because he did not know of the *Witherspoon* case at the time of the trial since he failed to argue its holding during the jury panel voir dire and, further, because he had difficulty stating the *Witherspoon* holding during his deposition for the habeas corpus proceedings. The record supports the contrary findings of the district judge and does not support the statements of the panel. Middaugh stated that he was well aware of *Witherspoon* but that he wanted the panel members excused because he

preme Court has now held that prospective jurors may not be excused, over objection, on the ground that their scruples against capital punishment might affect their deliberations on the *fact findings* at the punishment phase. *Adams v. Texas,* —— U.S. ——, 100 S.Ct. 2521, 64 L.Ed.2d —— (1980). That is not dispositive here because, except for panel member Schroeder, Jurek's counsel himself challenged or agreed to excusing those panel members mentioned who had scruples against the death penalty. He made no objection to the dismissal of Mrs. Schroeder. Furthermore, she said that the possibility of a death sentence would affect her deliberation on *guilt or innocence.* I read the Supreme Court to say that the State is entitled to exclude those persons whose attitude toward the death penalty would affect their decision on guilt.[4]

In *Blackburn v. Alabama,* 361 U.S. 199 at 206, 80 S.Ct. 274 at 280, 4 L.Ed.2d 242, Chief Justice Warren wrote:

> [T]here are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.

With that we all agree. There is no real issue among us about the constitutional rights of defendants. All of us, and all participants in this case from the beginning, are deeply dedicated to insuring that Jerry Jurek receives his full rights under the laws of Texas and the Constitution of the United States. But there *are* issues and other questions.[5] Can the criminal justice system be both fair and effective? Will it enjoy and deserve the respect and confidence of the public? Can all of the law be enforced? We cannot neglect those questions with impunity.

---

knew them and thought they would not be desirable jurors for Jurek's cause. When he was asked what *Witherspoon* held, several times he testified to this effect: "Well, basically, it says that a juror is qualified unless he would state under oath that he would automatically vote against the death penalty."

4. Judges Brown and *Gee do not necessarily* agree with this paragraph.

5. Compare the questions of Mr. Justice Jackson: *Watts v. Indiana,* 338 U.S. 49 at 61–62, 69 S.Ct. 1347 at 1359, 93 L.Ed. 1801.